In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2767

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAHMOUD SHAMAH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06-CR-782-2—**Robert W. Gettleman,** *Judge.*

ARGUED MAY 28, 2010—DECIDED OCTOBER 12, 2010

Before MANION, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Mahmoud "Mike" Shamah was a Chicago police officer who decided, along with his partner Richard Doroniuk, that they could supplement their income by shaking down drug dealers. Using information given to them by an informant, they identified drug dealers and stole money and drugs from them. They were caught, and both were charged with conspiracy in violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), along with other charges. Doroniuk pleaded guilty, but Shamah was convicted by a jury.

Shamah appeals, arguing that he cannot be guilty under RICO because he was not an operator or manager of the Chicago Police Department and because his agreement with Doroniuk was to commit thefts, not robberies. Shamah also challenges his sentence, arguing that the robbery guideline was inapplicable; his sentence enhancements were inappropriate; and his sentence was substantively unreasonable because of the sentencing disparity between him and his partner.

We reject these arguments. We affirm Shamah's RICO conviction because the evidence was more than sufficient to show that Shamah played a daily role in directing the affairs of the police department and that the conspiracy between him and his co-conspirator was to rob drug dealers. We also affirm his sentence, finding that the district court properly applied the sentencing guidelines and enhancements, and the disparity in sentencing was not substantively unreasonable.

## I. BACKGROUND

Mike Shamah and Richard Doroniuk were corrupt Chicago police officers. They worked as partners in the 22nd District on a tactical unit and would often patrol high-crime gang areas. In 2004, they began discussing the idea of keeping money they seized from suspected drug dealers during traffic stops and searches of premises.

From 2005 through October 2006, the partners put their scheme into action. If a suspect was unsure about the exact amount of cash he had on his person, Shamah and Doroniuk would inventory some of the cash and pocket the rest. They would take the money on the spot or withhold a portion of the money during the booking and inventory process back at the station. The officers also took drugs so they could plant them on people if a future stop or search did not establish probable cause for an arrest.

In May 2006, Shamah and Doroniuk began to work with drug dealer Larry Cross. Cross became their personal informant and guide to drug dealers who could be counted on to have large amounts of cash or drugs. Cross also became their go-to "John Doe" informant for the purposes of obtaining search warrants from state judges, meaning that he provided the basis for a warrant without being named. Several warrant searches were based on false information provided by Cross. During vehicle stops and premises searches, Shamah and Doroniuk used guns, handcuffs, and other police powers to break down doors and restrain suspects. The partners evenly split any proceeds once they determined if and in what amount Cross should be paid.

During trial, Doroniuk and Cross testified to their roles in the conspiracy. In addition to the testimony of FBI agents and surveillance officers, the government also introduced testimony of five victims: Cleottis Love, Brandon Lucas, Titus Bates, Matthew Smith, and Jermaine Benton. The first incident involved Love. In Decem-

ber 2005, an informant provided officers with information about drug dealing at Love's house. Doroniuk and Shamah entered this house without a warrant, planted cocaine on Love, arrested him, and kept a portion of the cash they found in his pockets. In March 2006, the second incident occurred. Shamah and Doroniuk went to the "Candy Store," a well-known drug house. They kicked in the door and arrested multiple people, including Lucas, the owner of the Candy Store. He was handcuffed and had money taken from him. The third incident was in July 2006, when Cross told the officers that Bates was dealing crack cocaine from a specific room in a motel. Shamah and Doroniuk, along with some other Chicago police officers, rushed into the room while Bates was opening the door. He was arrested and placed in handcuffs. And the money and drugs he had in his pockets were stolen by Doroniuk. During the fourth incident, in August 2006, Shamah and Doroniuk, claiming they believed a car was stolen, approached it with their guns drawn. They arrested the passengers in the car, one of whom was Smith, who also testified about the incident. In addition, Doroniuk testified that he took Smith's cash and a small amount of marijuana at the scene, and later withheld some of the cash from inventory. Finally, Benton testified that in September 2006, Shamah and Doroniuk approached his car with their weapons drawn. Doroniuk testified that he and Shamah had smelled marijuana. Benton was arrested, and some of his cash was withheld from inventory.

Shamah and Doroniuk were eventually the targets of a Federal Bureau of Investigation ("FBI") undercover investigation. As part of that investigation, Cross was

told that large amounts of cocaine and money were being kept in a storage locker unit. Cross passed this information on to Shamah and Doroniuk. The two officers took Cross to a state judge, and Cross falsely testified to his personal knowledge of the contents of the storage unit. On June 13, 2006, having obtained a search warrant, Shamah and Doroniuk went with other police officers to the unit, found a bag that was filled with $20,000, took it, and never inventoried any of the money. Approximately two months later, the FBI set up a similar undercover scheme, and during a search they again stole money from a storage unit.

Shamah, Doroniuk, and Cross were arrested and charged with RICO conspiracy and civil rights conspiracies, possession of a firearm during and in relation to a violent crime, conspiracy to steal government funds, and two counts of theft of government funds. Doroniuk and Cross both pleaded guilty and testified as government witnesses at Shamah's trial. The jury acquitted Shamah of possessing a firearm during and in relation to a violent crime, but it convicted him of the remaining counts in the indictment. The district court sentenced Shamah to 232 months' imprisonment, and he timely appealed.

## II. ANALYSIS

### A. Sufficiency of the Evidence Arguments

We review sufficiency of the evidence challenges by viewing the evidence in the light most favorable to the government and will reverse only if no reasonable

factfinder could find the defendant guilty beyond a reasonable doubt. *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). We have frequently described a defendant posing this challenge as facing a "nearly insurmountable hurdle." *Id.*; *see United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998) ("Only if the record is devoid of evidence from which a jury could find guilt will we reverse.").

Shamah was convicted of conspiring to violate the substantive RICO statute. The RICO conspiracy provision makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c)" of the RICO statute. 18 U.S.C. § 1962(d). Shamah was charged with conspiring to violate subsection (c), which makes it "unlawful for any person employed by or associated with [an] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity of collection of unlawful debt." 18 U.S.C. § 1962(c). To prove a violation of § 1962(c), the government must prove the following elements: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 963 (7th Cir. 2000). Shamah challenges the sufficiency of the government's proof on the conduct and pattern of racketeering activity elements.

### 1. Sufficient Evidence of RICO Enterprise

To be liable under RICO, there must be "operation" of an "enterprise". Shamah argues that the government

failed to prove that he, a "lowly" police officer, played any role in directing the affairs of the Chicago Police Department, the charged enterprise. As an officer, he argues that he exercised no direction over the department because he had no authority to make command decisions, no supervisory powers over other officers, and no control over department-wide policies. He also argues that his actions could not rise to a level of criminal culpability because he was merely performing his assigned tasks as a police officer when he deployed his powers of arrest and seized contraband.

The statutory language of § 1962(c) does not define what it means "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, the Supreme Court defined the meaning of "participate" and "to conduct" for § 1962(c), the substantive offense at issue here. 507 U.S. 170, 177-79 (1993). The Court held that although liability was not limited to those in the "upper management" of an enterprise, it must be shown that the defendant participated in the "operation or management" of the enterprise's affairs. *Id.* at 184-85; *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). To show participation, the Court stated that the person charged must have had "*some* part in directing those affairs." *Reves*, 507 U.S. at 179 (emphasis in original); *see Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) ("Mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise.").

In arguing that a street officer cannot be an operator or manager of a police department, Shamah relies heavily on *Cummings*, where we reversed a RICO conspiracy conviction against a defendant who held a low-level position in the charged enterprise, the Illinois Department of Employment Security. 395 F.3d at 397-98. There, the defendant accepted bribes from an outsider to the enterprise and in return, provided the outsider with confidential information from an internal database. Shamah wrongly contends that *Cummings* turned on the rank of the employee. Instead, we based our conclusion on the lack of evidence that the defendant operated or managed *any* aspect of the enterprise, its database, or conspired with anyone who did. *Id.* at 398. The defendant's access to the enterprise's computer database was incidental to her role in the enterprise, she accessed it infrequently, and had no responsibility to maintain it. We also focused on the function of the enterprise, stating that it may have been a different case if the defendant was acting in a way that interfered with the agency's primary function of collecting premiums or paying benefits. *Id.* at 399. We did not rely on a job title or official role in the organization and indicated that evidence of "some de facto control over the agency's affairs" would have sufficed to show the defendant was an operator or manager. *Id.* at 398.

We have previously stated that the "prototypical" RICO case is one where a person seizes control of an enterprise and uses it to commit criminal acts he could not do himself. *Fitzgerald v. Chrysler*, 116 F.3d 225, 227 (7th Cir. 1997). Only "a step away" from the prototypical

case is one where a criminal uses an enterprise to engage in criminal activities but is generally "content to allow it to conduct its normal, lawful business." *Id.* That is the case we have here. And in a pre-*Reves* case, we rejected the argument that a police officer's lack of a supervisory position precluded his guilt under RICO. *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984), *abrogated on other grounds by United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989). Our sister circuits have similarly looked to the core-enterprise affairs and the actions of the charged defendant in determining whether the defendant is an operator or manager. In *United States v. Urban*, for example, the Third Circuit emphasized that the key to showing "operation or management" was a nexus between the person and the affairs of the enterprise. 404 F.3d 754, 769-70 (3d Cir. 2005). The First Circuit has described the operator or manager as someone who is "plainly integral" to carrying out the enterprise's activities. *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir. 1997).

Shamah and his co-defendant Doroniuk were operators for the purposes of RICO. The heart of a police department's function is to enforce the law, and not to manage other officers or implement policies. As an officer, even a "lowly" one, Shamah had the power to control the department's affairs and direct its force. With a substantial amount of discretion, Shamah chose who to stop on the street, which cars to pull over, and when to obtain arrest and search warrants. Furthermore, he acted as a representative for the larger police department and the city when he spoke to citizens, created

public inventory records, and testified to facts that served as the basis for warrants and indictments. As the public face of the department, Shamah was given a great deal of responsibility and trust in operating and directing its affairs. His manipulation of this power transformed legitimate police functions into arms of his illegal endeavors. He usurped the department's identity, and turned it into a criminal enterprise hiding behind a facade of justice.

The government presented ample evidence that Shamah and Doroniuk were not acting as "mere" law-abiding police officers when they forced civilians to part with money and drugs, performed illegal arrests and stops, and planted evidence on civilians. Given his discretion and authority as a police officer, and the way in which he chose to direct his powers, Shamah operated or managed the integral duties of the police department's daily affairs. And the government presented sufficient evidence for the jury to conclude that Shamah conducted the affairs of the enterprise.[3]

---

[3] The government also argues that it has proven that Shamah conspired to facilitate the actions of an operator or manager and that under § 1962(d), a defendant may conspire to violate § 1962(c) even if the defendant could not be characterized as an operator or manager himself. *Cf. MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995). But, this is only true if the defendant knowingly agreed to facilitate the activities of the operators or managers to whom § 1962(c) could apply. *United States v. Swan*, 250 F.3d 495, 499

(continued...)

### 2. Sufficient Evidence of Predicate Acts

The government also needed to prove that Shamah agreed to participate in at least two predicate RICO acts to establish a pattern of racketeering activity. *See* 18 U.S.C. § 1962(d); *Brouwer,* 199 F.3d at 966. The racketeering activity charged was multiple acts of robbery as defined by Illinois law. Under Illinois law, "[a] person commits robbery when he . . . takes property . . . from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1.

Shamah argues that the evidence is insufficient to show that the crimes to which he agreed to participate were robberies, and not thefts. Specifically, Shamah claims that he and his partner agreed to a series of thefts, with the moment of theft occurring back at the police station when the co-defendants decided what amount of money to withhold from inventory. He further explains that any force used was to effectuate a lawful arrest, at which time police procedures were followed to "seize" money according to forfeiture laws. According

---

[3] (...continued)

(7th Cir. 2001). In a legal enterprise such as the Chicago Police Department, Shamah was not acting under the direction or with the purpose of facilitating any unknowing officer's actions, and so, we are dependent on his role as an operator or manager alone. *See Brouwer*, 199 F.3d at 967 (stating that although one does not need to be the operator to be guilty of conspiracy, "[o]ne must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an *illegal* manner.") (emphasis added).

to official policy, officers are given the discretion to either place property in their police vests for later inventory at the scene; or to leave property on a suspect for collection during the booking process. However, the evidence at trial was more than sufficient for the jury to conclude that the conspiracy was an ongoing agreement to commit robberies, not thefts.

The distinction between a robbery and a theft can be subtle—theft is a taking without the requirement of force. 720 ILCS 5/16-1. To sustain a charge of robbery, the robber must use force or the threat of force as the means to take the property from the person or presence of the victim. *People v. Blake*, 579 N.E. 2d 861, 863 (Ill. 1991). But the taking does not need to be contemporaneous with the force. *Id.* at 865 (the "use and threat of force and the defendant's removal of the property were essentially a related series of acts."). And, the taking of property does not need to directly follow the force or threat of force as "there need only be some concurrence between the defendant's threat of force and the taking". *People v. Aguilar*, 676 N.E. 2d 324, 327 (Ill. App. Ct. 1997). Also, the force does not have to be exerted for the purpose of taking the property. *Id*.

Shamah used force or the threat of force as the means to take property from his victims on many occasions. We provide only a few examples here: Love testified that Shamah and Doroniuk forced down his door and entered his home without a warrant. Doroniuk handcuffed and planted cocaine on Love, and money was taken from him. Additionally, Love testified that at least

three times prior to the raid on his house, Shamah and Doroniuk would pull him over while he was driving, force him out of his car, search him, and take whatever money they found. On at least one of these stops they also had their guns drawn. On two different occasions, the two officers entered Lucas's garage, the place known as the "Candy Store," and robbed him. On February 19, 2006, Shamah and Doroniuk went to the Candy Store, knocked on the door, and pushed their way in after someone answered their knock. They did not have a warrant, and they had their guns drawn. They searched Lucas and his store, taking money from him personally and from a back room. On March 26, 2006, Shamah and Doroniuk went to the Candy Store again. They kicked down the door with their guns drawn, handcuffed Lucas, and took money and jewelry from him. Finally, Shamah and Doroniuk used force to rob Bates. Cross, their informant and co-conspirator, told them that Bates was selling crack cocaine from a particular motel room. The two officers, along with 4-6 other officers, forced their way into Bates' room as he was opening the door. Doroniuk handcuffed Bates, searched him, and took cash and cocaine from his pockets.

Clearly, the evidence showed that Shamah and Doroniuk used the force that came along with their police power as a way of subduing and preventing re-sistance from those they robbed. Drug dealers were their ideal targets because they tended to carry large amounts of money and would not likely be credible if they complained about the police officers' actions. The government also introduced evidence of Shamah and

Doroniuk discussing ways they could get more money from someone they believed was a particularly profitable drug dealer, including a suggestion by Doroniuk that they take money "off duty" with a "ski mask on" if necessary. Given this evidence, a reasonable jury had more than enough evidence to conclude that Shamah and Doroniuk had an on-going agreement to rob drug dealers.

We also easily dispose of Shamah's argument that he was just "doing his job" and that each arrest was preceded by probable cause. Shamah and Doroniuk created opportunities to engage with drug dealers for the purpose of robbing them, and some of the arrests or searches were blatantly unauthorized and illegal. Doroniuk testified that his standard practice was to keep property in his police vest when arresting suspects, unless another officer was nearby, and that he preferred to arrest the drug dealers on whom he planted evidence or robbed so that their complaints would seem even less legitimate. From this evidence, the jury could conclude that the arrests were made to effectuate the robberies and continue the conspiracy, and not to enforce the law. The jury was properly instructed on the elements of robbery, and there was sufficient evidence for a reasonable jury to conclude that an agreement existed between the officers to rob whenever the opportunity arose for them to do so.

## B. Sentencing Challenges

At sentencing, the district court began by determining the appropriate guideline range under the United States

Sentencing Guidelines ("U.S.S.G."). Although the guidelines are advisory, the sentencing judge must first correctly calculate the range and then, using the sentencing factors of 18 U.S.C. § 3553(a), decide whether to impose a sentence within that range. *United States v. Nelson*, 491 F.3d 344, 347 (7th Cir. 2007).

The base offense level was calculated primarily from the guideline for the civil rights conspiracy conviction, and each underlying offense for the conspiracy count was grouped together. The underlying offenses were eight robberies—the five victims who testified at trial, plus three other victims that Doroniuk testified about. Starting with a base offense level of 20 (U.S.S.G. § 2B3.1(a)), the district court also added the following enhancements: five levels for brandishing or possessing a firearm (U.S.S.G. § 2B3.1(b)(2)(C)), two levels for physical restraint via handcuffs (U.S.S.G. § 2B3.1(b)(4)(B)), and six levels for acting under color of law (U.S.S.G. § 2H1.1(b)(1)(B)). The enhancement for use of body armor was also added for one of the robberies. U.S.S.G. § 3B1.5(2)(A). Five levels were added because more than five robberies were committed. U.S.S.G. §§ 3D1.1 and 3D1.4. Shamah's total offense level was 40, resulting in a guidelines range of 292-to-365 months' imprisonment. Concerns of over-counting and the 161-to-234 month disparity between Doroniuk's 131-month sentence and Shamah's potential sentence led the court to lower Shamah's sentence to 232 months. This was 60 months lower than the low-end of Shamah's guideline range.

The district court's legal application of the sentencing guidelines is reviewed de novo. *United States v.*

*Hernandez*, 544 F.3d 743, 746 (7th Cir. 2008). We review factual findings supporting a sentencing enhancement for clear error, *United States v. Bermea-Boone*, 563 F.3d 621, 627 (7th Cir. 2009), and only reverse if a review of the evidence leaves us "firmly convinced" that a mistake has been made. *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1107 (7th Cir. 2009). Where a district court has properly calculated the guidelines range, we review sentences for reasonableness, using an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Panaigua-Verdugo*, 537 F.3d 722, 727 (7th Cir. 2008). The district court is given great deference in balancing the 18 U.S.C. § 3553(a) sentencing factors, and a sentence that falls within a properly calculated guidelines range is presumptively reasonable. *Panaigua-Verdugo*, 537 F.3d at 727.

### 1. Any Error Regarding Number of Robberies Was Harmless

The district court applied the robbery guideline, U.S.S.G. § 2B3.1, to eight arrests. Although Shamah contends that some of these incidents were thefts, and not robberies, the district court stated that "the arrests themselves were sufficient to constitute, particularly under a preponderance standard, evidence of robbery rather than theft." The district court went on to state that it was "ruling for the government on that as did the jury on the specific incidents that they were directed to rule on." Shamah challenges the district court's application of the robbery guideline to each of the eight incidents because the jury did not find that each incident was

a robbery, and he does not believe that each incident was a robbery.

Shamah is correct that the jury did not definitively find that all of the eight arrests were robberies. The jury only needed to find that Shamah and Doroniuk conspired to commit two underlying predicate acts of robbery in order to convict Shamah on the RICO conspiracy charge. And, a couple of the arrests *may* have been thefts and not robberies because of the time and distance between the force and the taking of property. For example, Benton did not have any money taken from his person. It was only after he was arrested and taken back to the station that his money was withheld from inventory. But to the extent that one or two of the eight arrests were improperly deemed robberies by the district court, such error is harmless. The district court only needed to find that more than five of the incidents were robberies to justify a five-level enhancement under U.S.S.G. § 3D1.4. And the record supports this finding.

### 2. Sentencing Enhancements for Armor, Weapons, and Restraints

Shamah also contests the enhancements for brandishing a weapon, using handcuffs, and wearing body armor. He argues that all officers carry these tools as part of their uniform, and use them in proper arrest procedure to ensure officer safety, so they cannot be the basis of sentencing enhancements. Shamah further argues that even if they can be the basis of sentencing enhancements, there was insufficient evidence for the district court to apply these sentencing enhancements in his case.

That Shamah's police tools had a second, legitimate purpose does not make the enhancements inappropriate. *United States v. Haynes*, 582 F.3d 686, 712 (7th Cir. 2009). The theory of the government's case was that the defendants manipulated their power to arrest in order to rob drug dealers. In *Haynes*, another case involving a corrupt Chicago police officer, the defendant argued that the use of body armor was a specific offense characteristic because he used the body armor to make his targets believe they were engaged in legitimate law enforcement activity. He claimed that the use of the body armor was already accounted for by the specific offense conduct, so it could not also be the basis of an enhancement. *Haynes*, 582 F.3d at 712; *see* U.S.S.G. § 3B1.3 (an "adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."). There, we rejected the idea that the enhancement should not apply: "The court drew the reasonable inference that the body armor was being used for its primary purpose—for protection. The fact that the body armor may also have been used to identify the defendant officers as legitimate Chicago cops engaged in lawful police activity doesn't make the enhancement inappropriate." *Haynes*, 582 F.3d at 712; *see United States v. Barrett*, 552 F.3d 724, 728 (8th Cir. 2009) (stating that "[t]he ability of body armor to serve dual purposes" did not make the enhancement inappropriate). In the context of possessing or brandishing a weapon, other circuits have stated the same, holding that just because a defendant may be required to carry a weapon does not entitle that defendant to a blanket exception to the application of an

enhancement. *United States v. Partida*, 385 F.3d 546, 562 (5th Cir. 2004); *United States v. Sivils*, 960 F.2d 587, 596 (6th Cir. 1992); *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir. 1990).

The evidence was more than sufficient for the district court to apply the sentencing enhancements here. Doroniuk testified that victims were stopped at gunpoint and restrained by handcuffs. Each testifying victim also stated that Shamah drew his weapon and that he was physically restrained during the encounter. As to the use of body armor, Bates testified before the grand jury that the officers were wearing police vests, and Doroniuk testified about the Bates robbery at trial. Contrary to his argument, Shamah is not receiving these enhancements for each time he used handcuffs or pulled a gun on a suspect as a legitimate law enforcement tool. These enhancements are for the specific times where those tools were used to effectuate a robbery. The district court did not err in relying on trial testimony, grand jury testimony, and the Pre-Sentencing Report in applying enhancements on the ground that weapons were possessed or brandished during these encounters, that victims were physically restrained, and that Shamah wore a bulletproof vest during one incident.

Finally, Shamah argues that the jury acquitted him of possessing a firearm during and in relation to a violent crime, and so he cannot receive the enhancement for possessing or brandishing a firearm during the robbery of Matthew Smith. This argument also fails. A sentencing court may consider conduct of which a defendant has been acquitted, as long as that conduct is proved by a

preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 157 (1997). The district court did not clearly err in relying on trial testimony that Shamah and Doroniuk drew their weapons during Smith's traffic stop in order to effectuate a robbery, so the enhancement was not improper.

### 3. Shamah's Sentence Was Reasonable

Shamah argues that his sentence was substantively unreasonable. Again, where the sentencing guidelines range has been properly calculated, we review the reasonableness of a sentence for an abuse of discretion. *Gall*, 552 U.S. at 41; *Panaigua-Verdugo*, 537 F.3d at 727. A below-guidelines sentence is presumed reasonable against a defendant's challenge that it is too high. *Panaigua-Verdugo*, 537 F.3d at 727. We do not reverse simply because we might have imposed a different sentence, *United States v. Scott*, 555 F.3d 605, 610 (7th Cir. 2009), as reasonableness contemplates a range.

The district court sentenced Shamah to 232 months' imprisonment, which was 60 months lower than the low end of his guidelines range. Our review of the record convinces us that the district court thoughtfully considered the § 3553(a) sentencing factors and adequately stated why its sentence was appropriate. *See Scott*, 555 F.3d 608-09. The court addressed Shamah's personal history and strong family support, the nature of the offense, mitigating factors raised on Shamah's behalf, and the unlikelihood that Shamah would recidivate upon his release. Shamah argues that the district court

spent too much time discussing the general problem of corrupt police officers and the need for general deterrence, but the court specifically stated that it was punishing Shamah for his actions and not the actions of others.

Shamah also argues that the district court did not sufficiently take into consideration the disparity in the sentences between him and his co-conspirator, as Doroniuk was sentenced to 131 months' imprisonment. *See* 18 U.S.C. § 3553(a)(6) (requiring a sentencing court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). A within-guidelines sentence necessarily gives weight and consideration to avoiding unwarranted sentencing disparities. *United States v. Bartlett*, 567 F.3d 901, 907-08 (7th Cir. 2009). Here, the district court gave a below-guidelines sentence, and specifically addressed the large disparity. Although the court recognized that Doroniuk would serve much less time for equally culpable conduct, the court believed the difference in sentencing was appropriate given Doroniuk's guilty plea, cooperation with the government, and testimony at trial against his fellow officer. *See United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) ("Statham's co-defendants entered plea agreements with the government, cooperated in the investigation, and had less-extensive criminal histories. The district court was entitled to take these facts into account when it chose each person's sentence.").

The district court considered the relevant sentencing factors in choosing a below-guidelines sentence. We

conclude that Shamah's below-guidelines sentence was a reasonable one, in light of all the relevant circumstances.

### III.  CONCLUSION

For the reasons expressed above, we AFFIRM Shamah's conviction and sentence.

10-12-10