In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2172

MICHAEL J. DEGUELLE,

*Plaintiff-Appellant,*

*v.*

KRISTEN J. CAMILLI, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:10-cv-00103—**J. P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 27, 2011—DECIDED DECEMBER 15, 2011

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. Michael J. DeGuelle, a tax employee of S.C. Johnson & Son, Inc., was terminated after reporting an alleged tax fraud scheme to the company and federal law enforcement agencies. Following his termination, DeGuelle filed suit asserting two civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d). The district

court dismissed DeGuelle's RICO claims with prejudice, finding that the predicate acts alleged were either unrelated or did not proximately cause DeGuelle's injuries. DeGuelle believes the district court erred in finding that the appellees' retaliatory acts were unrelated to the alleged tax fraud scheme. Because we find that the acts are related under the Supreme Court's "continuity plus relationship" test, the judgment of the district court will be reversed.

## I. BACKGROUND

We review *de novo* the district court's finding that DeGuelle failed to state a claim for relief under RICO. *Rennell v. Rowe*, 635 F.3d 1008, 1010 (7th Cir. 2011). Construing the complaint in a light most favorable to DeGuelle, we accept all well-pleaded facts as true and draw all possible inferences in DeGuelle's favor. *Golden v. Helen Sigman & Assocs., Ltd.*, 611 F.3d 356, 360 (7th Cir. 2010).

DeGuelle worked for S.C. Johnson & Son, Inc. ("SCJ"), from approximately January 2, 1997, to April 10, 2009. SCJ employs approximately 12,000 people and sells household consumer products in more than 110 countries. DeGuelle was employed in SCJ's tax department, first as an International Tax Compliance Manager and later as a State Tax Manager.

In December of 2000, SCJ received Internal Revenue Service ("IRS") audit reports for fiscal year-ends ("FYE")

1998, 1999, and 2000. Defendant-Appellee Daniel Wenzel, Global Tax Counsel, delivered these reports to DeGuelle for review. DeGuelle discovered that SCJ improperly received $5,082,048 in foreign tax credits. In January of 2001, DeGuelle reported his findings to Wenzel and asked how these errors should be remedied. Wenzel responded that they should wait and "[t]his is why I go to church on Sundays." Wenzel reported DeGuelle's findings to Defendant-Appellee Robert Randleman, Vice President and Corporate Tax Counsel, but not to the IRS. Instead, Wenzel directed DeGuelle to alter or destroy records so that the errors would not be detected. Subsequently, altered reports were submitted to the IRS via United States mail.

In 2002, Wenzel instructed DeGuelle and a fellow employee to structure a transaction so that SCJ could claim a tax deduction by exploiting tax accounting rules. Wenzel told DeGuelle and his fellow employee to fabricate a business purpose for the transaction and then destroy associated business records in case "the IRS examines this transaction in the future." DeGuelle believes SCJ received a benefit in excess of $2,000,0000 in the form of reduced tax liability as a result of this structured trans-action. Further, Wenzel received a significant discretionary bonus for his role.

In February of 2005, Wenzel directed DeGuelle to fraudulently alter an income statement, which would result in approximately $3,700,000 in financial benefits for SCJ. DeGuelle refused to alter the statement.

He discussed his concerns with Donald Pappenfuss, a supervisor within the tax department, who instructed DeGuelle to alter the form pursuant to Wenzel's instructions. Wenzel approved the altered income statement and submitted it to the IRS by mail.

In June of 2005, Pappenfuss submitted a fraudulently amended tax return for FYE 1998 in order to take advantage of the IRS's previous auditing errors. Randleman approved the return and sent it to the IRS via mail. DeGuelle alleges that Randleman knew of the IRS's errors at the time he approved the amended 1998 tax return.

In July of 2007, DeGuelle and Pappenfuss discussed the need to set aside a reserve to cover potential exposure on an intercompany loan. Pappenfuss directed DeGuelle to take his concerns to Wenzel, who refused to create a reserve and downplayed the likelihood of such a reserve being necessary.

DeGuelle met with Defendant-Appellee Kristen Camilli, Director of Human Resources, in October of 2007 to discuss his allegations that Wenzel was creating a hostile work environment. Camilli and DeGuelle had a follow-up meeting on January 9, 2008, during which Camilli informed DeGuelle that she investigated his complaints and determined that Wenzel had not created a hostile working environment. DeGuelle then informed Camilli of the IRS audit errors and Wenzel's instructions to destroy or alter records. Camilli requested documentation supporting DeGuelle's allegations, which DeGuelle provided to Camilli on January 14,

2008. DeGuelle also spoke with Defendant-Appellee
Gayle Kosterman, who informed him that an internal
committee had decided to hire an outside law firm
to investigate DeGuelle's allegations of tax fraud. DeGuelle
discussed his concerns with two attorneys from the law
firm of Kirkland & Ellis LLP on January 17, 2008.

In March of 2008, Wenzel told DeGuelle to bring
any concerns about issues in the tax department to appro-
priate department personnel instead of taking such con-
cerns to accounting or human resources. Wenzel was
loud and physically aggressive toward DeGuelle during
this meeting. Wenzel also made disparaging comments
about DeGuelle in front of other SCJ employees. That
same month, DeGuelle received a negative six-month
performance review even though such mid-year reviews
were not routine, and despite the fact that DeGuelle
received an Officer's Award in recognition of his superior
job performance in January of that year.

DeGuelle had several meetings with Camilli and
Kosterman following this negative review. First,
DeGuelle met with Camilli on March 12, 2008, to discuss
his performance review. He also met with Kosterman
on March 14, 2008, to discuss his concerns regarding
the tax credits and his personal issues with Wenzel.
In April of 2008, Camilli met with DeGuelle about a salary
adjustment. Camilli indicated she needed to talk about
DeGuelle's salary increase with Wenzel first. (DeGuelle
also raised the salary issue with Wenzel, who acknowl-
edged a ten percent raise might be appropriate but "given

some of the problems we have had in the past few months, I don't think that will be happening this year.")

Kosterman met with DeGuelle again in May of 2008. She informed DeGuelle that no one at SCJ committed any wrongdoing and he was paranoid for thinking he would suffer reprisal from Wenzel. She recommended DeGuelle meet with Wenzel and a human resources coach to mend their relationship. It's unclear whether such coaching occurred, but the relationship between DeGuelle and Wenzel did not improve.

In August of 2008, DeGuelle met with Camilli and expressed his concerns about the reserve issue he raised with Pappenfuss and Wenzel in July of 2007. DeGuelle indicated that he would have to pursue an internal audit if no reserve was set aside. Camilli relayed DeGuelle's statements to Wenzel. All three parties met on August 28, 2008, to discuss the issue. Wenzel was confrontational and aggressive toward DeGuelle and accused DeGuelle of not bringing the issue to his attention. DeGuelle and Camilli met once again on September 10, 2008, to discuss DeGuelle's concerns for his safety in light of Wenzel's behavior.

On September 23, 2008, Wenzel and DeGuelle had another verbal altercation and DeGuelle received a negative "needs improvement" performance review from Wenzel. DeGuelle contacted Camilli and alleged that his review was retaliation for his whistleblowing activities. Camilli informed DeGuelle on October 10, 2008, that the negative review would be investigated. In November,

DeGuelle contacted Camilli in writing and informed her he would contact state or federal agencies regarding Wenzel's retaliatory acts if SCJ refused to take action.

On December 18, 2008, DeGuelle met with Kosterman and Camilli. They informed DeGuelle that the negative review was retaliatory in nature and it would be revoked. They also discussed a possible salary adjustment and transfer to a different department at SCJ. Kosterman directed DeGuelle to drop his complaints of tax fraud, but DeGuelle stated he would file a whistleblower complaint with the Department of Labor. Later that day, Kosterman and Camilli contacted DeGuelle by telephone and informed him that he would receive a salary increase. They also offered to make a partial payment of DeGuelle's attorney's fees if DeGuelle agreed to sign a release of claims and confidentiality agreement. DeGuelle believes this offer came from W. Lee McCollum, Executive Vice President and Chief Financial Officer, and Defendant-Appellee Mark Eckhardt, Vice President and Chief Information Officer.

Instead of accepting the company's offer, DeGuelle filed a whistleblower complaint under the Sarbanes-Oxley Act with the Department of Labor on December 18, 2008. He attached financial statements, tax documents, and internal communications to his complaint.

DeGuelle met with Kosterman in January of 2009 to retract his salary request because he feared it could be viewed as an attempt to benefit from SCJ's tax fraud scheme. Kosterman stated that she had not interpreted

his request in this way and she restated her belief that no illegal activity had occurred.

DeGuelle continued to contact federal agencies about SCJ's tax fraud. He also emailed Dr. H. Fisk Johnson, Chief Executive Officer, requesting a meeting and again stating his belief that the tax department was engaging in illegal acts. This email was forwarded to Kosterman, who met with DeGuelle on February 10, 2009, and informed him he needed to "move beyond these issues." Camilli notified DeGuelle that she had looked into his concerns and no illegal or fraudulent activity was discovered. She told him "we need to move forward." On February 17, 2009, the Department of Labor determined that SCJ was not a covered entity under the Sarbanes-Oxley Act.

The tax department filed a fraudulent second amended tax return for FYE 1998 on March 10, 2009. This tax return was signed by Eckhardt and sent to the IRS by mail. Like previous altered documents sent to the IRS, this return sought to obtain a tax refund related to foreign tax credits.

On March 19, 2009, DeGuelle provided SCJ counsel with a five-page memorandum detailing his concerns about tax fraud within the company. Kosterman also reviewed this memorandum. Kosterman met with DeGuelle and offered him the opportunity to resign with one year of salary and benefits if he signed a confidentiality agreement and released all claims. Again, DeGuelle refused SCJ's offer.

Three weeks later, on April 9, 2009, SCJ began investigating DeGuelle for misconduct relating to his disclosure of

confidential business documents outside of the company.
DeGuelle met with Camilli and other investigators.
During that interview, DeGuelle denied disclosing confi-
dential business documents but admitted to attaching
documents to his Department of Labor complaint.
He asserted that Camilli was well aware of his disclosures.
Following the interview, DeGuelle was placed on adminis-
trative leave and sent home. The following day he
was terminated for taking confidential business docu-
ments, disclosing them outside the company, and being
untruthful during the investigation. Eckhardt and
Kosterman made the decision to terminate DeGuelle. The
company also demanded return of any SCJ property in
DeGuelle's possession.

SCJ subsequently filed a lawsuit against DeGuelle in
Racine County Circuit Court seeking recovery of SCJ
property, documentation, and other confidential informa-
tion. SCJ also sued DeGuelle for breach of contract and
conversion.[1] In the months following the institution of
SCJ's lawsuit, SCJ allegedly made defamatory statements
against DeGuelle that were published in local media
outlets.

On February 5, 2010, DeGuelle filed the present lawsuit
in the Eastern District of Wisconsin, alleging violations of

---

[1] On June 23, 2011, the circuit court ruled in favor of SCJ,
finding that DeGuelle is liable for $50,000 in damages and that
SCJ is entitled to the return of all SCJ documents in DeGuelle's
possession. DeGuelle is appealing the court's decision.

RICO, breach of contract, wrongful termination, and defamation. Defendants-Appellees filed a motion to dismiss on February 17, 2010. The district court granted this motion on April 12, 2010, dismissing DeGuelle's RICO claims with prejudice and the remaining state law claims without prejudice. DeGuelle filed his timely notice of appeal on May 11, 2010.

## II. ANALYSIS

Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. § 1964(c). A cause of action under § 1964(c) requires a plaintiff to plead "(1) an injury in its business or property (2) by reason of (3) the defendants' violation of section 1962." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 685 (7th Cir. 2008) (internal quotation marks and brackets omitted). DeGuelle appeals the district court's dismissal of his §§ 1962(c) and 1962(d) RICO claims.

To survive a motion to dismiss, "a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, which is sufficient to provide the defendant with fair notice of the claim and its basis." *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (internal quotation marks omitted). A plaintiff may not rely on mere labels, conclusions, or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In addition, the complaint must state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

*A. Section 1962(c)*

DeGuelle's first RICO claim alleges that the appellees violated § 1962(c), which makes it unlawful for an employee of an enterprise engaged in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To state a claim for relief under § 1962(c), DeGuelle must allege "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Shamah*, 624 F.3d 449, 454 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1529 (2011). The parties dispute whether a "pattern of racketeering activity" was properly alleged in the complaint.

A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" is limited to the specific acts statutorily enumerated in 18 U.S.C. § 1961(1). DeGuelle's complaint alleges several acts of racketeering, including mail fraud in violation of 18 U.S.C. § 1341; tampering with a witness in violation of 18 U.S.C. § 1512(b)(3); altering, destroying, mutilating, or concealing a document with the intent

to obstruct justice in violation of 18 U.S.C. § 1512(c)(1); and retaliation against a witness or informant in violation of 18 U.S.C. § 1513(e)-(f). The parties do not dispute that these alleged predicate acts occurred within a ten-year period.

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, the Supreme Court held that to show a pattern of racketeering activity, a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity. 492 U.S. 229, 239 (1989). A relationship is established if the criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (*quoting* 18 U.S.C. § 3575(e)). Continuity can be a closed- or open-ended concept. *Id.* at 241. Closed-ended continuity refers to criminal behavior that has ended but "the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007). In contrast, open-ended continuity requires a showing of past conduct that "by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241. The "continuity plus relationship" test established in *H.J.* allows lower courts to apply a flexible test in determining what constitutes a pattern, while at the same time addressing Congress's concern that RICO target only long-term criminal conduct. *See id.* at 239, 242.

Even if a plaintiff establishes a RICO violation through a pattern of racketeering activity under § 1962(c), a plaintiff may only recover for damages to one's "business or property" occurring as a result of that violation. *See Evans v. City of Chicago*, 434 F.3d 916, 924-25 (7th Cir. 2006); 18 U.S.C. § 1964(c). A RICO plaintiff's injuries must be "by reason of" a violation of § 1962. 18 U.S.C. § 1964(c). This requires a showing of "but for" causation and proximate cause. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004). Here, DeGuelle alleges that he suffered injuries to his business or property in that he was terminated from his employment, sued in Racine County Circuit Court, and defamed in local media outlets. In light of DeGuelle's injuries, logically he can only claim he was injured "by reason of" the appellees' retaliatory actions. But we agree with the district court that the § 1513(e) retaliatory acts on their own do not demonstrate a pattern of racketeering activity. Those acts by themselves do not satisfy the closed- or open-ended continuity requirement.[2] Thus, in order for DeGuelle's claims to have

---

[2] The district court held that the retaliation scheme did not meet the closed-ended continuity test because it occurred over a short period of time, involved only a few predicate acts, and targeted only one victim. *DeGuelle v. Camilli*, No. 10-CV-0103, 2010 WL 1484236, at *8 (E.D. Wis. Apr. 12, 2010). Further, the open-ended continuity test was not satisfied because "there is nothing to indicate that the defendants' retaliatory actions against the

(continued...)

any merit, the retaliation predicate acts must be grouped with other predicate acts of fraud to form a pattern of racketeering activity. To do so, these predicate acts must be related.

The district court determined that DeGuelle's complaint alleged two unrelated schemes: "tax fraud" and "retaliation." Because the district court considered the alleged predicate acts as two separate schemes, the retaliatory actions taken against DeGuelle (terminating DeGuelle, filing a lawsuit, and making defamatory statements) were considered unrelated to the predicate acts alleged as part of the tax fraud scheme (mail fraud, destroying records, and offering DeGuelle benefits in exchange for his silence). The district court reasoned that the two schemes were unrelated because they involved different actors, motives, and victims. The tax fraud scheme was undertaken by Wenzel, Pappenfuss, and Randleman, while the retaliation scheme was carried out by Camilli, Kosterman, and Eckhardt. The tax fraud scheme aimed to defraud the IRS of tax revenue while the retaliation scheme's sole purpose was to retaliate against DeGuelle for being a whistleblower. Since none of the retaliatory acts occurred prior to DeGuelle's whistle-blowing, such acts could not support a theory that the appellees were attempting to "cover up" their

---

[2] (...continued)
plaintiff will repeat into the future, such as a specific threat of repetition or the nature of the enterprise." *Id.* at *9.

tax fraud. In other words, by the time DeGuelle suffered retaliation, the government was already aware of SCJ's wrongdoing.

DeGuelle argues that the Sarbanes-Oxley Act's addition of § 1513(e) as a RICO predicate act allows his claim to proceed. Congress enacted the Sarbanes-Oxley Act to address growing concerns about the reliability and accuracy of disclosures made by publicly-traded corporations. *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002). In addition to protecting investors, Title VIII of the Act provides protection for whistleblowers and prohibits retaliation against employees who provide evidence of fraud to a government agency. *See* 18 U.S.C. § 1514A. The Sarbanes-Oxley Act also added subsection (e) to 18 U.S.C. § 1513. That section provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1513(e). Section 1513(f) subjects wrongdoers to the same penalties for entering into a conspiracy to commit such acts. Under RICO, violations of § 1513 are considered "racketeering activity." 18 U.S.C. § 1961(1). Prior to enactment of the Sarbanes-Oxley Act,

retaliation against an employee in the form of interference with his or her lawful employment was not considered a racketeering act, *see, e.g.*, *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 953 (8th Cir. 1999), and courts denied RICO standing to employees terminated for refusing to cooperate in an alleged racketeering scheme, *see Corporate Healthcare Fin., Inc. v. BCI Holdings Co.*, 444 F. Supp. 2d 423, 432 (D. Md. 2006) (listing cases).[3]

The addition of § 1513(e) as a predicate act raises issues about the relationship between retaliatory actions and the underlying wrongdoing. The language of § 1513(e) and logic imply that retaliatory actions always occur after a whistleblower reports others' wrongdoing. Under the district court's reasoning, retaliation cannot be related

---

[3] Many cases addressing RICO retaliation claims since the enactment of the Sarbanes-Oxley Act have declined to reconsider these issues. *See, e.g.*, *Hoatson v. N.Y. Archdiocese*, No. 05 Civ. 10467, 2007 WL 431098, at *6 (S.D.N.Y. Feb. 8, 2007) ("Retaliatory firing is clearly not a listed predicate act or 'racketeering activity.'"), *aff'd*, 280 F. App'x 88 (2d Cir. 2008); *Herrick v. South Bay Labor Council*, No. C-04-02673, 2004 WL 2645980, at *3 (N.D. Cal. Nov. 19, 2004) (whistleblower terminated in retaliation for reporting her concerns could not bring RICO claim because her injuries stemmed from wrongful discharge, not alleged racketeering activity); *but cf. Vierria v. Cal. Highway Patrol*, 644 F. Supp. 2d 1219, 1236-37 (E.D. Cal. 2009) (termination of employee constituted racketeering activity under section 1513(e)).

to the underlying wrongdoing for purposes of RICO because the retaliatory acts will always occur after the underlying wrongdoing has been disclosed. Thus, there is no "cover up." In addition, the motives and victims will almost never be the same. We can conceive of very few cases in which a single retaliatory act would be considered "related" to other predicate acts under this reasoning. This is troubling when one considers the purposes of the Sarbanes-Oxley Act and its addition of § 1513(e) to RICO's statutory scheme.

When an employer retaliates against an employee, there is always an underlying motivation. In this case, for example, the motivation was to retaliate against DeGuelle *for disclosing the tax scheme*. Retaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower. Although there may not be the same victims or results, in most cases retaliatory acts and the underlying scheme "are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240. Accordingly, we believe a relationship can exist between § 1513(e) predicate acts and predicate acts involving the underlying cause for such retaliation. Such a finding is consistent with the Supreme Court's flexible standard and acknowledges the rationale behind the Sarbanes-Oxley Act's whistleblower provisions.[4]

---

[4] We acknowledge that there is a danger, as expressed by many courts prior to the enactment of the Sarbanes-Oxley Act, that

(continued...)

This is not to say that a predicate act of retaliation will always be related to the underlying wrongdoing. Courts must still examine the facts of each case in determining whether the alleged predicate acts satisfy the "continuity plus relationship" test in that they are "not isolated events." For instance, the district court's finding of two independent schemes in this case, if we were to adopt this point of view, would indicate that the retaliatory acts were isolated events separate and apart from the tax fraud scheme. But the allegations contained within the complaint suggest otherwise. We believe the district court erred in finding that the retaliatory actions taken against DeGuelle were unrelated to the ongoing tax fraud scheme.

DeGuelle alleges violations of four statutes which are considered "racketeering activity." First, DeGuelle alleges several instances of mail fraud in violation of 18 U.S.C. § 1341. These acts occurred in December 2000, February 2005, June 2005, and March 2009. DeGuelle alleges that Wenzel, Randleman, Pappenfuss, and Eckhardt participated in these fraudulent activities. Next, DeGuelle alleges violations of 18 U.S.C. § 1512(c)(1), which prohibits the destruction of records. DeGuelle alleges that

---

[4] (...continued)
plaintiffs will bring claims which should be handled by state law (i.e., wrongful termination) into federal court under the guise of RICO. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). But we are confident the continuity requirement will often weed out those claims which do not truly demonstrate a threat of continued wrongdoing.

Wenzel instructed him to destroy records in 2002 so that they would not be discovered by the IRS. DeGuelle's third series of allegations focus on illegal tampering with a witness in violation of 18 U.S.C. § 1512(b)(3). DeGuelle alleges that in December of 2008, Camilli, Kosterman, and Eckhardt offered to pay him a higher salary and to pay his attorney's fees if he agreed to sign a confidentiality agreement and release all claims. This offer came after DeGuelle informed Kosterman and Camilli that he intended to file a whistleblower complaint with the Department of Labor. In addition, in March of 2009, Kosterman offered DeGuelle the opportunity to resign in exchange for one year of salary and benefits if he agreed to sign a confidentiality agreement and release all claims. Finally, DeGuelle alleges that Camilli, Kosterman, and Eckhardt engaged in retaliatory acts against him in violation of 18 U.S.C. § 1513(e)-(f) by terminating his employment, filing a lawsuit against him, and disseminating defamatory statements to the press.

The district court found that the alleged acts of retaliation (including his termination, the lawsuit, and defamation) were unrelated to the alleged acts of fraud (including mail fraud, destroying records, and corrupt persuasion to get DeGuelle to sign a confidentiality agreement). The district court noted the different victims, participants, and motives. But the district court's interpretation overlooked key allegations linking the predicate acts. First, the district court overlooked DeGuelle's allegation that Eckhardt participated in both the mail fraud and

retaliatory acts. The complaint alleges that Eckhardt signed a fraudulent tax return before submitting it to the IRS in March of 2009. The appellees argue that this allegation lacks sufficient particularity to demonstrate that Eckhardt played a role in the fraud scheme. But even if this is true, the district court also did not recognize that Kosterman, Camilli, and Eckhardt were responsible for the first act of tampering in December of 2008. These three actors offered DeGuelle an increase in salary and payment of attorney's fees if he agreed to sign a confidentiality agreement and release all claims. This offer occurred after DeGuelle informed human resources he planned to file a whistleblower complaint. The district court clearly identified this act as part of the fraud scheme, and rightly so, as it was intended to prevent DeGuelle from disclosing the company's alleged wrongdoing. Yet the district court did not recognize that these same three actors were also responsible for DeGuelle's termination, thus providing a link between the fraud scheme and the retaliation scheme.

In addition, there is a temporal relationship between the predicate acts in this case, such that under *H.J.*, we can conclude that these acts "otherwise are interrelated by distinguishing characteristics and are not isolated events." 492 U.S. at 240. The first act of tampering, which the parties and the district court agree is related to the alleged acts of mail fraud, occurred in December 2008. During the same month, DeGuelle filed his Department of Labor complaint. An additional act of mail fraud occurred in March 2009. Shortly thereafter, a second act of tampering occurred in which Kosterman offered DeGuelle the

opportunity to resign with pay and benefits if he signed a confidentiality agreement and release of claims. After DeGuelle refused, he was terminated in early April 2009. It is reasonable to infer from the alleged facts that Kosterman, recognizing all attempts to silence DeGuelle had failed, resorted to retaliatory termination as a result. The lawsuit and defamatory statements followed shortly thereafter. Thus, over a five-month period, the company engaged in two acts of tampering, one act of mail fraud, and three acts of retaliation. Moreover, the second act of tampering preceded DeGuelle's termination by a very short period of time. It is safe to say these were not isolated events.

Admittedly, some of the actions taken by Kosterman and Camilli are inconsistent with any alleged involvement in the tax fraud scheme. The human resources department apparently took DeGuelle's allegations seriously, prompting the hiring of an outside law firm to investigate tax fraud within the company. In addition, both Kosterman and Camilli investigated DeGuelle's negative performance review. After they determined the review was retaliatory in nature, it was revoked. Despite these inconsistencies, however, there are enough allegations within the complaint to conclude, at this stage in the proceedings, that Kosterman and Camilli were participants in the RICO scheme. For instance, Kosterman and Camilli attempted to silence DeGuelle by offering him incentives if he signed a confidentiality agreement. They also participated in DeGuelle's termination, an alleged act of retaliation.

In light of the above discussion and the "relatively broad" relationship standard, *United States v. Maloney*, 71 F.3d 645, 661 (7th Cir. 1995), we find that the predicate acts alleged in the complaint are related. Additionally, we find that the continuity requirement is satisfied. As noted by the district court, the predicate acts of tax fraud satisfy the closed-ended continuity test because these acts occurred over a period of five years and involved several actors and methods of commission. Grouping the § 1513(e) predicate acts with the alleged acts of tax fraud does not undermine this closed-ended continuity analysis. Instead, this grouping includes additional predicate acts, victims, and injuries, further supporting a finding of closed-ended continuity. *See Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986) ("Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.").

The appellees assert that the continuity requirement has not been satisfied because the alleged wrongdoing revolves around foreign tax credits for FYEs 1998, 1999, and 2000. The scheme, appellees argue, is based on mistakes made by the IRS in audit reports and there is no indication that such mistakes will occur in the future. Thus, there is a built-in termination point and the scheme cannot support an inference of a continuing criminal threat. But the appellees overlook additional allegations of tax fraud within the complaint which are not limited to foreign tax credits, such as the structuring

of a transaction to exploit tax accounting rules, fabrication of a business purpose for the transaction, and destruction of documents after completion of the transaction. In addition, the complaint alleges that Wenzel instructed DeGuelle to fraudulently alter an income statement for FYE 2004. These allegations indicate that the alleged tax fraud scheme extended beyond foreign tax credits and beyond FYEs 1998, 1999, and 2000.

Because the "continuity plus relationship" test is satisfied, we conclude that DeGuelle has properly alleged a pattern of racketeering activity under § 1962(c). The district court's decision with regard to § 1962(c) must be reversed.

### B.  Section 1962(d)

DeGuelle's second RICO cause of action alleges a conspiracy under 18 U.S.C. § 1962(d). As with his § 1962(c) claim, DeGuelle must allege that he was injured "by reason of" a violation of § 1962. *See* 18 U.S.C. § 1964(c). "[I]njury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)." *Beck v. Prupis*, 529 U.S. 494, 505 (2000). A RICO conspiracy plaintiff must "allege injury from an act that is . . . independently wrongful under RICO." *Id.* at 505-06. DeGuelle alleges that a wrongful predicate act, retaliation under 18 U.S.C. § 1513(e), proximately caused his injuries.

In order to state a claim for § 1962(d) conspiracy, "a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001). "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). The defendant need not personally commit a predicate act; rather, a plaintiff must allege that the defendant agreed that *someone* would commit at least two predicate acts in furtherance of the conspiracy. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999).

"A conspiracy to violate RICO may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 674 (7th Cir. 2005) (internal quotation marks and brackets omitted). A defendant's physical presence during the commission of a predicate act is not enough, *id.* at 675, and not all substantive RICO violations constitute conspiracies, *see id.*

The district court did not determine whether the complaint properly alleged an agreement to commit tax fraud, finding instead that DeGuelle failed to prove causation. In light of our analysis above, this finding is in error. DeGuelle has properly alleged that his termination was proximately caused by a RICO predicate act of retaliation. We are therefore left to determine whether DeGuelle's complaint properly alleges an agreement.

The complaint alleges that Wenzel, Randleman, and Pappenfuss[5] engaged in tax fraud in order to receive significantly higher discretionary bonuses. DeGuelle first alleges that Wenzel informed Randleman of the IRS's errors in January of 2001. Afterwards, Wenzel instructed DeGuelle to alter or destroy records. In 2005, DeGuelle approached Pappenfuss with his concerns, but he was directed by Pappenfuss to do as Wenzel directed. Later that same year, Pappenfuss prepared a fraudulent tax return at the instruction of Wenzel and Randleman. As alleged in the complaint, these men stood to personally benefit from the filing of amended tax returns based on the IRS's errors. Further, there are sufficient factual allegations indicating that these men worked in tandem within the tax department and made decisions together. One could infer that these three agreed to participate in the affairs of an enterprise through

---

[5] Although Donald Pappenfuss is listed as a defendant in the complaint, DeGuelle did not appeal the district court's judgment as to Pappenfuss.

a pattern of racketeering activity, and further agreed to commit at least two predicate acts of mail fraud.

In order to state a claim for relief, however, DeGuelle must allege that this conspiracy proximately caused his injuries. The complaint indicates that Wenzel, Randleman, and Pappenfuss only engaged in acts of mail fraud and did not participate in decisions to silence or terminate DeGuelle. Thus, DeGuelle must allege that an agreement existed between the three tax department conspirators and Eckhardt, Kosterman, or Camilli.

DeGuelle alleges that all of the appellees in this case had knowledge of illegal acts, discussed those acts, and facilitated commission of those acts such that it may be inferred that there was an agreement among all of the appellees. DeGuelle notes that he informed Camilli of Wenzel and Randleman's actions in January of 2008, and Wenzel was aware of this report by March 2008. Thus, there must have been some communication between Wenzel and Camilli. In addition, Camilli and Randleman initially approved Wenzel's negative performance review, Kosterman and Camilli offered to pay DeGuelle's attorney's fees to persuade him not to expose the tax fraud scheme, and Eckhardt and Kosterman also attempted to silence DeGuelle so that he could not disclose further information to outside parties. Finally, DeGuelle points out that Eckhardt signed and filed a fraudulent tax return and was involved in the decision to terminate DeGuelle (along with Camilli and Kosterman).

Eckhardt's one alleged act of mail fraud occurred in March of 2009, nearly four years after any prior alleged act of fraud. This one isolated event is not enough to infer that an agreement existed between Eckhardt and the tax department conspirators to engage in tax fraud. DeGuelle argues, however, that coupling Eckhardt's act of fraud with his acts of tampering and/or retaliation establishes an agreement with the other conspirators to commit tax fraud and conceal it. Although "efforts to conceal a conspiracy are not automatically a part of the conspiracy," *United States v. Masters*, 924 F.2d 1362, 1368 (7th Cir. 1991), a conspiracy may still include an agreement to conceal the defendants' crime if such acts of concealment are "done in furtherance of the main criminal objectives of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 405 (1957).

We can easily infer that the tax department conspirators intended to conceal their crimes: Wenzel and Randleman did not disclose the foreign tax credit errors to the IRS and DeGuelle was ordered on more than one occasion to alter or destroy records to prevent detection. Even though Eckhardt, Camilli, and Kosterman may not have been involved in the formation of the conspiracy, "parties may still be found guilty even though they join or terminate their relationship with the core conspirators at different times." *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985). Eckhardt, Camilli, and Kosterman engaged in acts aimed at preventing DeGuelle from disclosing information outside the company. It can be inferred from the facts of the complaint that these

actions against DeGuelle were part of the original conspira-
tors' agreement to conceal their fraud.[6]

Although the complaint's allegations as to the existence
of an agreement are sparse, at this stage in the proceedings,
there are enough allegations to infer that an agreement
existed. Undoubtedly these allegations will be explored in
greater detail throughout the discovery process. Accord-
ingly, DeGuelle's § 1962(d) claim should survive.

---

[6] As noted previously, some of Camilli and Kosterman's actions
are inconsistent with a finding that all of the appellees were
participating in the same conspiracy. For instance, Camilli and
Kosterman initiated an investigation into DeGuelle's allegations
of tax fraud. This investigation included disclosure of company
materials to third parties outside the company. This behavior is
inconsistent with an agreement among the appellees to conceal
acts of fraud. Further, although Camilli may have initially
approved Wenzel's negative performance review, she later
investigated the retaliatory nature of the review and revoked it.
Again, this action refutes the notion that Camilli was working in
furtherance of a conspiracy with Wenzel. Finally, Wenzel
specifically told DeGuelle not to go to human resources with his
concerns. This indicates that he was not working in agreement
with Camilli and Kosterman. All of these acts, however, oc-
curred prior to the first act of tampering by Camilli, Kosterman,
and Eckhardt. We may infer from the complaint that these three
appellees did not agree to participate in the conspiracy prior to
their commission of this first predicate act. Accordingly, these
facts do not necessarily foreclose DeGuelle's claim.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion.

12-15-11