In the

# United States Court of Appeals
### For the Seventh Circuit

No. 18-3232

STEVEN MENZIES,

*Plaintiff-Appellant,*

*v.*

SEYFARTH SHAW LLP, an Illinois limited liability partnership, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-3403 — **John Robert Blakey**, *Judge.*

ARGUED MAY 22, 2019 — DECIDED NOVEMBER 12, 2019

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Insurance executive Steven Menzies sold over $64 million in his company's stock but did not report any capital gains on his 2006 federal income tax return. He alleges that his underpayment of capital gains taxes (and the related penalties and interest subsequently imposed by the Internal Revenue Service) was because of a fraudulent tax shelter peddled to him and others by a lawyer, law firm, and

two financial services firms. Menzies advanced this contention in claims he brought under the Racketeer Influenced and Corrupt Organizations Act or RICO and Illinois law. The district court dismissed all claims.

Menzies's RICO claim falls short on the statute's pattern-of-racketeering element. Courts have labored mightily to articulate what the pattern element requires, and Menzies's claim presents a close question. In the end, we believe Menzies failed to plead not only the particulars of how the defendants marketed the same or a similar tax shelter to other taxpayers, but also facts to support a finding that the alleged racketeering activity would continue. To conclude otherwise would allow an ordinary (albeit grave) claim of fraud to advance in the name of RICO—an outcome we have time and again cautioned should not occur. In so holding, we in no way question whether a fraudulent tax shelter scheme can violate RICO. The shortcoming here is one of pleading alone, and it occurred after the district court authorized discovery to allow Menzies to develop his claims.

As for Menzies's state law claims, we hold that an Illinois statute bars as untimely the claims advanced against the lawyer and law firm defendants. The claims against the two remaining financial services defendants can proceed, however.

So we affirm in part, reverse in part, and remand.

## I

The original and amended complaints supply the operative facts on a motion to dismiss. On appeal we treat all allegations as true, viewing them in the light most favorable to Steven Menzies. See *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005).

Menzies is the co-founder and president of an insurance company called Applied Underwriters, Inc. or AUI. In 2002 advisers from Northern Trust approached him to begin a financial planning relationship. In time these advisers pitched Menzies and his colleague and AUI co-founder Sydney Ferenc on a tax planning strategy (dubbed the Euram Oak Strategy) to shield capital gains on major stock sales from federal tax liability. Not knowing the strategy reflected what the IRS would later deem an abusive tax shelter, Menzies agreed to go along with the scheme. He conducted a series of transactions that, through the substitution of various assets and the operation of multiple trusts, created an artificial tax loss used to offset the capital gains he realized upon later selling his AUI stock.

Northern Trust worked with others in marketing and implementing the strategy. Christiana Bank, for example, served as trustee for some of Menzies's trusts while tax attorney Graham Taylor and his law firm, Seyfarth Shaw, provided legal advice. Taylor repeatedly assured Menzies and Ferenc of the tax shelter's legality, eventually opining that there was a "greater than 50 percent likelihood that the tax treatment described will be upheld if challenged by the IRS." Taylor stood by his more-likely-than-not opinion even after being indicted in 2005 for the commission of unrelated tax fraud—a development he never disclosed to Menzies.

In 2006 Menzies sold his AUI stock to Berkshire Hathaway for over $64 million. Nowhere in his 2006 federal income tax return did Menzies report the sale or any related capital gains. Nor did Christiana Bank, which filed tax returns on behalf of Menzies's trusts, report any taxable income from the stock

sale. When the IRS learned of these developments, it commenced what became a three-year audit and found that the primary purpose of the Euram Oak Strategy was tax evasion. Facing large fines and potential adverse legal action, Menzies agreed in October 2013 to settle with the IRS, paying over $10 million in back taxes, penalties, and interest.

In April 2015 Menzies filed suit in the Northern District of Illinois, advancing a civil RICO claim and various Illinois law claims against Taylor, Seyfarth Shaw, Northern Trust, and Christiana Bank. The district court granted the defendants' motion to dismiss, but from there twice allowed Menzies to amend his complaint. Indeed, the district court afforded Menzies a full year of discovery to develop facts to support renewed pleading of the RICO claim that appeared in his second amended complaint in August 2017. On the defendants' motion, the district court dismissed that complaint for failure to state any claim. Menzies now appeals.

## II

### A.  The RICO Bar for Actionable Securities Fraud

Before addressing the district court's dismissal of Menzies's RICO claim, we confront a threshold issue pressed by the defendants—whether an amendment to the RICO statute added by the Private Securities Litigation Reform Act of 1995 or PSLRA precluded Menzies from bringing a RICO claim in the first instance. We agree with the district court that the bar now embodied in 18 U.S.C. § 1964(c) did not prevent Menzies from pursuing a RICO claim on the facts alleged in his complaint.

In enacting the PSLRA, Congress did more than seek to curb abusive practices in securities class actions by, for example, imposing a heightened pleading standard, requiring a class representative to be the most adequate plaintiff, and limiting damages. See *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 475–76 (2013) (describing the PSLRA). The enactment also amended RICO to prohibit a cause of action based on "any conduct that would have been *actionable as fraud in the purchase or sale of securities*." 18 U.S.C. § 1964(c) (emphasis added).

Upon reviewing the allegations in Menzies's original complaint, the district court denied the defendants' motion to dismiss the RICO claim based on the bar in § 1964(c). The district court started with the observation that "nothing about the sale of his AUI stock itself was fraudulent." *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1116 (N.D. Ill. 2016) ("*Menzies I*"). "By selling Plaintiff a bogus tax shelter plan," the court reasoned, "[d]efendants were attempting to hide the resulting income from Plaintiff's sale of stock from the IRS," and "[i]n both form and substance" this was a "case about tax shelter fraud, not securities fraud." *Id*.

The defendants urge us to reverse, contending that the RICO bar applies because the whole point of the Euram Oak Strategy was for Menzies to avoid realizing taxable gains from a stock sale. But for the stock sale, the tax shelter meant nothing, thereby easily satisfying, as the defendants see it, the requirement for the alleged fraud to be "in connection with" the sale of a security and thus actionable as securities fraud under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

We see the analysis as more difficult. By its terms, the bar in § 1964(c), as the district court recognized, requires asking whether the fraud Menzies alleged in his complaint would be actionable under the securities laws, in particular under section 10(b) and Rule 10b-5. See *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010) (assessing the PSLRA bar and explaining that "[a]ctions for fraud in the purchase or sale of securities are controlled by section 10(b) of the Securities Exchange Act of 1934"); *Bixler v. Foster*, 596 F.3d 751, 759–60 (10th Cir. 2010) (adopting a similar approach); *Affco Investments 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 189–90 (5th Cir. 2010) (same).

Had he sought to plead a securities fraud claim under those provisions, Menzies would have had to allege a material misrepresentation or omission by a defendant, scienter, a connection between the misrepresentation or omission and the purchase or sale of a security, reliance, economic loss, and loss causation. See *Glickenhaus & Co. v. Household Int'l., Inc.*, 787 F.3d 408, 414 (7th Cir. 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). The district court got it right in concluding that the allegations in Menzies's original complaint did not amount to actionable securities fraud under federal law.

The Supreme Court supplied substantial direction in *SEC v. Zandford*, 535 U.S. 813 (2002). The SEC brought a civil securities fraud action against a stockbroker who sold his elderly and disabled clients' securities and pocketed the proceeds. See *id.* at 815. The Court granted review to determine whether the stockbroker's theft, which the SEC alleged also constituted securities fraud, was sufficiently "in connection with" the sale of the clients' securities to fall within section 10(b) and Rule

10b-5. The Court answered yes, explaining that both provisions "should be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Id*. at 819 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)). As a practical pleading matter, the Court continued, that meant a plaintiff need not allege any misrepresentation or omission about a security's value. Nor was it necessary to allege misappropriation or, even more generally, another form of manipulation of a security. What would be enough, the Court held, are allegations where "the scheme to defraud and the sale of securities coincide." *Id.* at 822.

The SEC's allegations met this standard because the stockbroker defendant, alongside affirmatively misrepresenting how he intended to manage his clients' investments—he "secretly intend[ed] from the very beginning to keep the proceeds"—acted on that intent by engaging in unauthorized securities sales. *Id.* at 824. This misconduct "deprived [his clients] of any compensation for the sale of their valuable securities." *Id.* at 822. The "securities transactions and breaches of fiduciary duty coincide[d]," the Court explained, because the "[clients'] securities did not have value for the [stockbroker] apart from their use in a securities transaction and the fraud was not complete before the sale of securities occurred." *Id.* at 824–25. Put another way, the SEC's allegations left no daylight between the alleged fraud and the securities sale.

Measured by these *Zandford* standards, Menzies's allegations do not satisfy the "in connection with" requirement for an actionable claim under section 10(b) or Rule 10b-5. Start with the alleged fraud itself. Menzies's complaint focused not on the AUI stock sale, but instead on its tax consequences. He

alleged that the defendants marketed a tax shelter that they knew was abusive—that would conceal capital gains from the U.S. Treasury—and caused him to incur not just unexpected taxes and related interest and penalties but also substantial professional fees. Yes, this may be enough to show that but for following the defendants' advice and selling his AUI stock he would not have incurred the taxes and related interest and penalties. Yet we know that such "but for" allegations do not satisfy section 10(b) under the teachings of *Zandford*. See *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (explaining that "[i]t is not sufficient [under section 10(b) and Rule 10b-5] for an investor to allege only that it would not have invested but for the fraud" and instead the investor must go further and "allege that, but for the circumstances that the fraud concealed, the investment … would not have lost its value") (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648–49 (7th Cir. 1997)).

If Menzies had tried to bring a securities fraud claim, he would have had to close this pleading gap. His complaint would have had to tether more directly the fraud to the stock sale by including allegations that went beyond any "but for" link and allowed a finding that the defendants' misrepresentations more closely coincided with Menzies's sale of his AUI stock. Menzies, in short, would have needed to plead facts demonstrating that he incurred his alleged losses as a more direct consequence of misrepresentations that closely touched the stock sale itself and not just its tax consequences. That the purpose of the tax shelter aimed to maximize the profits that Menzies realized from his stock sale cannot itself bridge this gap. See *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012) (affirming a district court's conclusion that the RICO bar did not apply because the plaintiffs' "fraud

claim relates only to the tax consequences of the Benistar Plan, and it is merely incidental that the [insurance] policies happen to be securities"); *Rezner*, 630 F.3d at 872 (concluding the RICO bar did not apply where, in a tax shelter fraud, "the securities were merely a happenstance cog in the scheme").

We can come at the analysis another way. No aspect of the complaint challenged any term or condition on which Menzies sold his AUI shares to Berkshire Hathaway. The complaint all but says every aspect of the stock sale itself was entirely lawful. Even more generally, no portion of the complaint alleged that any defendant engaged in an irregularity that tainted or affected the stock-sale transaction, including, for example, by influencing the sales price or somehow causing the proceeds to be mishandled. Every indication is that Menzies received every last dollar he expected from the sale. The fraud Menzies alleged is at least one step removed—focused not on the sale of the AUI stock but on how and why he charted a particular course in his treatment of the sale for federal tax purposes and the losses he sustained by doing so.

Do not read us to say that Menzies failed to allege fraud. He plainly did when considered through the prism of common law standards. What we cannot say, though, is that—for purposes of applying the RICO bar in § 1964(c)—Menzies's allegations amounted to actionable securities fraud under the standards the Supreme Court has told us are required by section 10(b) and Rule 10b-5.

While not aligning with the defendants' view of the law, our holding does seem on all fours with what we see and do not see in the securities fraud case law. Our research, limited though it is to reported decisions, reveals no meaningful

number of section 10(b) and Rule 10b-5 private federal securities fraud claims brought to challenge abusive tax shelters. Nor do we see an indication that the SEC has brought many enforcement proceedings alleging securities fraud to combat abusive tax shelters. None of this suggests that fraud perpetrated as part of a scheme to evade taxes can never be actionable under section 10(b). Our point is limited only to the observation that the federal reporters do not contain many examples of such actions, whether by private parties or the SEC. And perhaps that reality owes itself, at least in part, to the demanding requirements for pleading a federal securities law claim.

Unable to conclude that Menzies's allegations of fraud would be actionable under section 10(b) or Rule 10b-5, we turn, as did the district court, to his civil RICO claim.

## B. Civil RICO Claims and the Pattern Element

Enacted in response to long-term criminal activity, including, of course, acts of organized crime, RICO provides a civil cause of action for private plaintiffs and authorizes substantial remedies, including the availability of treble damages and attorneys' fees. See 18 U.S.C. § 1964(c). Establishing a RICO violation requires proof by a preponderance of the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (interpreting § 1964(c)). It follows that a plaintiff must plead these elements to state a claim. Congress defined a "pattern of racketeering activity" to require "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5).

Satisfying the pattern element is no easy feat and its precise requirements have bedeviled courts. See *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (emphasizing that "courts carefully scrutinize the pattern requirement"); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991) ("Satisfying the pattern requirements—that there be continuity and relationship among the predicate acts—is not easy in practice.").

The Supreme Court has considered the issue at least twice, and our case law shows many efforts to articulate what a plaintiff must plead to establish a pattern of racketeering activity. See, *e.g.*, *Sedima*, 473 U.S. at 496; *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237–38 (1989); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 779–80 (7th Cir. 1994); *McDonald v. Schencker*, 18 F.3d 491, 497 (7th Cir. 1994). Over these many cases the law has landed on a pleading and proof requirement designed "to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (citing *H.J., Inc.*, 492 U.S. at 240–41).

To plead a pattern of racketeering activity, "a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity"—a standard known as the "continuity plus relationship" test. *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). The Supreme Court announced this test in *H.J., Inc.* and made plain that the relationship prong is satisfied by acts of criminal conduct close in time and character, undertaken for similar purposes, or involving

the same or similar victims, participants, or means of commission. See 492 U.S. at 240. The relatedness of the predicate acts often does not yield much disagreement, and much more often the focus is on the continuity prong of the test. See *Vicom*, 20 F.3d at 780.

Just so here: the battleground in this appeal is whether Menzies adequately pleaded the continuity dimension of the continuity-plus-relationship test. Doing so requires "(1) demonstrating a closed-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Roger Whitmore's Auto Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 673 (7th Cir. 2005).

Do not let the labels create confusion. The big picture question is whether Menzies adequately alleged that the challenged conduct occurred and went on long enough and with enough of a relationship with itself to constitute a pattern. Answering that question is aided by focusing on two, more particular, inquiries. One of those inquiries—designed to ascertain the presence of a so-called "closed-ended" series of misconduct—asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue. See *Vicom*, 20 F.3d at 779–80. The focus, therefore, is on "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id*. at 780 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)).

The alternative continuity inquiry—applicable to an "open-ended" series of misconduct—focuses not on what acts

occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward. See *id.* at 782. This can be done by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes. See *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016). On these fronts, it is not enough to base an open-ended continuity theory on just one prior predicate act and an otherwise unsupported assertion that criminal activity will continue into the future. See *Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006) (explaining that when "a complaint explicitly presents a distinct and non-recurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity").

Added complexity enters where, as here, a plaintiff seeks to plead RICO's pattern element through predicate acts of mail or wire fraud. When that occurs the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require a plaintiff to do more than allege fraud generally. See *Jepson v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) ("Of course, Rule 9(b) applies to allegations of mail and wire fraud and by extension to RICO claims that rest on predicate acts of mail and wire fraud."). Rule 9(b) requires a plaintiff to provide "precision and some measure of substantiation" to each fraud allegation. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). Put more simply, a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Given these heightened pleading standards and Congress's insistence that a RICO claim entail a clear pattern of racketeering activity, we have cautioned that "we do not look favorably on many instances of mail and wire fraud to form a pattern." *Midwest Grinding*, 976 F.2d at 1024–25 (quoting *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990)); see also *Jennings*, 495 F.3d at 475 (explaining that this court "repeatedly reject[s] RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern"). We can leave for another day a more fulsome articulation of the interrelationship of RICO's pattern requirement and mail and wire fraud as predicate acts. Our focus here is whether Menzies, within the four corners of his complaint, alleged with sufficient particularity the acts of mail and wire fraud he believes demonstrate a pattern of racketeering activity.

### C. Menzies's Allegations of Racketeering Activity

In his second amended complaint, Menzies detailed chapter and verse the fraud the defendants allegedly perpetrated on him. He told of the defendants approaching and pitching him the tax benefits of the Euram Oak Strategy. Reassured multiple times of the shelter's legality, Menzies relied on the defendants' representations, executed the strategy's component steps through transactions with trusts and the like, and ultimately sold his AUI stock for over $64 million to Berkshire Hathaway. Again relying on the defendants' assurances, he then filed his 2006 tax return without reporting his AUI stock sale as a taxable event.

Menzies sought to plead RICO's pattern element by including allegations that the defendants marketed the identical or a substantially-similar tax shelter to three others—his business partner and co-founder of AUI, Sydney

Ferenc, and two other investors, one in North Carolina and another in Arizona.

Menzies alleged that Northern Trust contacted him and Ferenc at the same time to develop a financial advisory relationship. See SAC ¶¶ 25, 42, and 43. The complaint provides substantial detail on the defendants' interactions with Ferenc, including the dates and content of phone calls, emails, and meetings geared toward selling and advancing the scheme. See SAC ¶¶ 58, 62, 63, 76, 81, 86, 88, and 115. By way of example, consider these two factual allegations detailing the timing and substance of Ferenc's interactions with attorney Graham Taylor:

- "On September 30, 2003, Taylor provided Ferenc with an outline of the pre-arranged steps of the Euram Oak Strategy via email, assuring Ferenc that the strategy was legitimate tax planning." SAC ¶ 81.

- "On or about August 5, 2004, August 11, 2004 and August 18, 2004, Taylor sent Ferenc a revised version of the tax opinion letter via e-mail assuring Ferenc (and Menzies) that the Euram Oak Strategy was legitimate tax planning." SAC ¶ 115.

From there Menzies alleged that Ferenc ultimately "entered into a transaction substantially similar" to the one undertaken by Menzies, including by receiving a loan from Euram Bank, establishing a grantor trust, and maneuvering various assets in anticipation of a major stock sale—all in accordance with the instructions supplied by Taylor and others. SAC ¶ 91.

While the complaint clearly alleges the defendants marketed the same fraudulent tax shelter to Ferenc, Menzies stopped short of alleging whether Ferenc followed through with his sale of AUI stock and incurred substantial capital gains tax liability and related penalties and interest as a result of subsequent IRS scrutiny. The absence of such allegations in no way meant that Menzies failed to plead a predicate act of mail and wire fraud involving Ferenc, however. See *United States v. Koen*, 982 F.2d 1101, 1106 (7th Cir. 1992) (explaining that mail fraud under 18 U.S.C. § 1341 requires not actual and successful deception but only "(1) a scheme to defraud and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme to defraud").

Menzies further alleged an Arizona investor fell victim to the defendants' scheme. The second amended complaint alleged that the Arizona investor received legal opinions from Taylor and Seyfarth Shaw regarding the Euram Oak Strategy sometime in 2004. From there, though, the complaint says little more, alleging only that it is "reasonable to assume that any such opinion letter asserts the legality of the [Euram Oak] Strategy." SAC ¶ 162. On "information and belief," the complaint then alleges that the Arizona investor incurred unspecified damages from the tax deficiency that resulted from the scheme, penalties and interest, professional and attorneys' fees, and the lost opportunity to invest in a legitimate tax planning vehicle. See SAC ¶ 165.

In much the same way, Menzies included similar allegations of fraud against a North Carolina investor. According to the complaint, the defendants approached this investor not with the Euram Oak Strategy but with a different abusive tax shelter of the same nature called the Euram Rowan Strategy.

See SAC ¶¶ 166, 167. With the exception of Northern Trust, the other defendants pushed the Euram Rowan Strategy, which "involved a series of integrated, pre-arranged, and scripted steps designed to provide a taxpayer who had significant ordinary or capital gain with a non-economic ordinary or capital loss." SAC ¶ 167. Here too, however, the second amended complaint adds few details. In 2003 the North Carolina investor received legal opinions from Taylor and Seyfarth Shaw—leaving Menzies to allege that "it is reasonable to assume that any such opinion letter asserted the legality of the transaction." SAC ¶ 177. From there the complaint alleges that the North Carolina investor, as a result of the scheme, owed a tax deficiency of $17.5 million to the IRS, along with nearly $1 million in penalties. SAC ¶ 180.

The second amended complaint also included broad allegations of future harm. On this score, Menzies alleged that "[t]here is a threat of continued racketeering activity in that Defendants' predicate acts of mail and wire fraud were part of their regular way of conducting business." SAC ¶ 183. This future threat, the complaint added, is clear from the "manner in which the Euram products were presented as products, with a preexisting team that could execute and support the tax shelter for other taxpayers and from the regular manner in which this enterprise did business with Menzies, Ferenc, [the Arizona and North Carolina investors] and other investors in the fraudulent Euram strategies." SAC ¶ 184.

### D.  The District Court's Opinion

The district court dismissed Menzies's RICO claim for failing to adequately plead a pattern of racketeering under either the closed- or open-ended theories of continuity. See *Menzies*

*v. Seyfarth Shaw LLP*, No. 15C3403, 2018 WL 4538726 (N.D. Ill. Sept. 21, 2018) ("*Menzies II*").

As to the closed-ended approach, the court focused on Menzies's allegations of fraud against Ferenc and the North Carolina and Arizona investors. Relying on *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321 (7th Cir. 1998), the district judge assessed whether these additional allegations showed the other victims were "actually deceived" by the defendants' communications regarding the scheme. *Menzies II*, 2018 WL 4538726, at *4. The district court read Menzies's complaint to lack particularity about statements any defendant made to the Arizona investor about the Euram Oak Tax Strategy and, even more specifically, whether any misrepresentation led to the investor being deceived and suffering adverse tax consequences. The same deficiency plagued Menzies's allegations about the North Carolina investor, as the complaint was silent as to whether and how the defendants marketed the Euram Rowan Strategy in a way that resulted in actual deception and related losses. As to Ferenc, the district court emphasized that Menzies "does not allege that Ferenc was deceived, how he was deceived, or even that he suffered any injury in the way of IRS penalties or disallowances." *Id*. at *5.

In summing these pleading shortcomings, the district court reasoned that they were "particularly problematic in a case, like this one, where the purported victims knowingly entered into tax shelters, which by their nature are designed to avoid taxes." *Id*. The district court was unwilling to afford Menzies additional leeway to develop a potential RICO claim because he had already filed two prior complaints and had over a year to conduct discovery before filing his second amended complaint. See *id*. at *9.

Turning to whether that complaint adequately alleged an open-ended theory of continuity, the district court likewise concluded that Menzies came up short. The court emphasized that the complaint identified no specific threat of the tax avoidance strategy repeating, in no small part because the attorney responsible for orchestrating the scheme, Graham Taylor, had been indicted for tax fraud in 2005 and convicted in 2008. See *id.* at *6. These facts, without some alternative explanation from Menzies, undermined any meaningful possibility that Graham and the other defendants would continue to perpetuate the alleged fraud. See *id.* What is more, the district court was unwilling—without supporting facts appearing somewhere in Menzies's complaint—to permit an inference that the alleged fraud reflected any of the institutional defendants' regular way of doing business. On Menzies's pleading, the district court saw any such conclusion as reflecting rank speculation. See *id*. at *7.

### E. Menzies's Insufficient Pleading of the Pattern Element

We agree with the district court that Menzies failed to allege a pattern of racketeering based on mail and wire fraud predicates. The proper analysis begins by returning to Menzies's second amended complaint, and it is there that the details—or lack thereof—matter. This is so because of the combined demands of RICO's pattern element and Rule 9(b)'s particularity mandate.

Menzies is right that he pleaded enough to support a conclusion that what Sydney Ferenc experienced qualifies as a predicate act of racketeering activity for pattern purposes. The second amended complaint is replete with details describing how the defendants used phone calls, e-mails, and

meetings to assure Ferenc that the Euram Oak Strategy reflected lawful tax minimization. Those allegations speak directly to the nature and substance of the mail and wire fraud allegedly perpetrated on Ferenc and are advanced with the specificity necessary to clear Rule 9(b)'s particularity hurdle. And this is so even though Menzies's complaint does not allege that Ferenc went through with AUI stock sales and the Euram Oak Strategy tax treatment. See *Koen*, 982 F.2d at 1107.

Menzies's complaint is night and day different, though, when it comes to the allegations regarding the Arizona and North Carolina investors. The details of the defendants' interactions with both investors are few and far between. The second amended complaint says little more than that one or more of the defendants targeted these investors and sought to sell them either the Euram Oak or Rowan Strategies. Nowhere, though, does the complaint spell out the specifics of any defendant's communications with either investor and instead resorts to saying "on information and belief" that each of the two investors received an opinion letter from defendant Graham Taylor and furthermore that "it is reasonable to assume that any such opinion letter asserted the legality of the transaction." SAC ¶¶ 162, 177.

These allegations meet neither Rule 9(b)'s particularity requirement nor the demands of our RICO case law. In *Emery*, we emphasized that RICO's pattern element requires more than a plaintiff pointing to others and saying, on information and belief, that those persons received mailings about an allegedly fraudulent loan scheme. See 134 F.3d at 1322. The plaintiff needed to come forward, not with general statements about what others may have received, but with particular allegations detailing the content of the communications with

others allegedly defrauded by the defendant's conduct. See *id.* at 1323. Without those alleged facts there was no way to conclude that the plaintiff had advanced with particularity the predicate acts of mail or wire fraud against anyone other than himself. The complaint, in short, failed to plead the requisite pattern of racketeering activity. See *id*.

We see Menzies's second amended complaint in much the same way. He did not plead enough about what transpired with the Arizona and North Carolina investors for us to know what any defendant represented, misrepresented, or omitted. *Emery* teaches that the pleading bar requires more than positing that he believes these two investors received similar opinion letters from Graham Taylor. Resorting to that level of generality sidesteps what Rule 9(b) requires. What Menzies needed to do—drawing perhaps on what he learned in the year of discovery afforded by the district court—was allege at least some particulars about the precise communications with each investor. See *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996) (explaining the demands of Rule 9(b) are relaxed only if discovery is unavailable to a plaintiff). Without such allegations, we have no way to determine whether multiple predicate acts of mail or wire fraud occurred in a manner that satisfies RICO's pattern requirement.

Without predicate acts of fraud covering the Arizona and North Carolina investors, Menzies is left only with the allegations of what he and Sydney Ferenc experienced with the defendants. That falls short of pleading a pattern of racketeering under the closed-ended approach to the continuity-plus-relationship test that the Supreme Court announced in *H.J., Inc*. We need to look at the number and variety of predicate acts, the length of time over which they

were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Vicom*, 20 F.3d at 780; see also *Roger Whitmore's Auto Servs.*, 424 F.3d at 673 (explaining that, in this analysis, "[n]o one factor is dispositive"). In doing so, we keep foremost in mind a "natural and commonsense approach to RICO's pattern element," which requires enforcing "a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amount to, or threatened the likelihood of, continued criminal activity." *H.J., Inc.*, 492 U.S. at 237.

But here we only have two individuals (Menzies and Ferenc)—two business partners and indeed co-founders of AUI—who allegedly fell victim to the same fraudulent scheme (the Euram Oak Strategy) at the same time. While the scheme lasted from 2003 to 2006, the complaint alleges only that Menzies went through with the strategy and suffered adverse tax consequences. The second amended complaint says not a word about whether Ferenc followed through on the strategy or suffered financial harm of any kind. Given Menzies's close business relationship with Ferenc, the absence of particular factual allegations about how and to what degree Ferenc was defrauded is noteworthy.

On the whole, though, Menzies alleged enough with respect to Ferenc to establish a predicate act of mail or wire fraud. And with those allegations he advanced, in total, at least two such predicates (against himself and Ferenc). But RICO's pattern element is not just quantitative; it includes qualitative components designed to ascertain the presence of a pattern of racketeering activity. And it is on this precise

point—whether Menzies alleged enough, quantitatively and qualitatively, to show a qualifying pattern of racketeering activity—that we determine his pleading was deficient.

To conclude that Menzies has failed to plead closed-ended continuity is not to say that he has failed to plead fraud. He clearly has and indeed he uses those precise allegations of fraud as the basis for his state law claims against the defendants. But what we are not permitted to do is allow a plaintiff to shoehorn a state-law fraud claim into a civil RICO claim. See *Jennings*, 495 F.3d at 472. It is the statute's pattern element that separates the viable RICO wheat from the common-law chaff, and, despite substantial effort, Menzies has come up short.

Our analysis of the open-ended theory of a pattern of racketeering is more straightforward. Only a few lines of the second amended complaint even hint at any threat of continued fraud by the defendants, and even then Menzies presents only conclusory assertions to support those allegations. He urges us to infer a future threat of repetition because the Euram Oak Strategy was developed for marketing to many taxpayers and thus inherently presented a "threat of repetition" capable of defrauding others.

But "[a] threat of continuity cannot be found from bald assertions." *Vicom*, 20 F.3d at 783. The law requires us to examine Menzies's complaint for allegations of "predicate acts, [which] by their very nature, pose 'a threat of repetition extending indefinitely into the future,' or 'are part of an ongoing entity's regular way of doing business.'" *McDonald*, 18 F.3d at 497 (quoting *H.J., Inc.*, 492 U.S. at 242).

What we see is insufficient. Even if we credit Menzies's contention that the development and marketing of the Euram Oak Strategy foretold future offenses, the claim still would fail to measure up to the standard of alleging open-ended continuity. That the tax shelter scheme was, as our dissenting colleague puts it, an "off-the-rack product" capable of distribution to other victims does not alone threaten continuity. We cannot conclude as a legal matter—altogether without regard to what a plaintiff alleges in a complaint—that all fraudulent tax shelters designed for use by multiple taxpayers satisfy open-ended continuity for purposes of RICO's pattern element.

A close look at the complaint shows allegations suggesting that any risk of future fraud was drying up. As the district court highlighted, a grand jury indicted Graham Taylor for tax fraud in 2005, and he was convicted in 2008. With Taylor out of the factual equation it is unclear how Menzies's complaint supports any inference that the alleged scheme would continue. Menzies's complaint is full of indications that the scheme was running its course—reaching its "natural ending point," *Roger Whitmore's Auto Servs.*, 424 F.3d at 674—and was not being shopped to new targets:

- In 2007, Euram Bank divested from its subsidiary, Pali Capital, which made integral contributions to the implementation of the Euram Oak and Rowan strategies. SAC ¶ 19.

- In 2008, Seyfarth Shaw forced one of Taylor's colleagues who had helped with the opinion letters to resign for himself promoting illegal tax shelters. SAC ¶ 122.

- As early as 2003, Christiana Bank and Euram
  Bank were conducting internal investiga-
  tions with the assistance of outside counsel
  "regarding the possibility that the Euram
  Oak Strategy might be a reportable transac-
  tion to the IRS." SAC ¶ 94.

Nowhere does Menzies counterbalance these allegations
with facts suggesting the schemes promoted by the defend-
ants presented any meaningful prospect of continuing. In-
stead, the thrust of Menzies's complaint conveys that the de-
fendants were taking action to move away from the promo-
tion of the fraudulent tax shelters challenged here.

The dissent sees our analysis as falling prey to "hindsight
error" by considering these intervening events. Not so. All we
have done is reach a conclusion about the sufficiency of Men-
zies's RICO pleading by assessing the totality of his factual
allegations. We cannot stop halfway by, for example, over-
looking what Menzies chose to plead about Taylor's indict-
ment and what did (and did not) happen in its wake. The
open-ended continuity inquiry requires more than pinpoint-
ing a moment in time where it looked like a scheme may entail
continuity but then disregarding facts supplied by the plain-
tiff that point in the opposite direction. What is missing from
Menzies's second amended complaint is any factual allega-
tion supporting his conclusion that, following Taylor's arrest
and indictment, there existed a threat of the defendants fraud-
ulently marketing the tax shelter into the indefinite future.

Because Menzies did not plead a pattern of racketeering
under either an open- or closed-ended theory of continuity,
we agree with the district court's dismissal of his RICO claim.

## III

In closing we turn to Menzies's state law claims. Beyond his federal RICO claim, Menzies advanced claims under Illinois law for fraudulent misrepresentation, conspiracy, joint enterprise liability, negligent misrepresentation, breach of fiduciary duty, and unjust enrichment. Exercising supplemental jurisdiction, the district court addressed each of these claims in one broad stroke. The court determined each claim was untimely under the five-year statute of repose formerly found in Illinois Securities Law, 735 ILCS 5/12 *et seq.*, and in effect during the relevant period—in particular, during the five years after Menzies's May 2006 sale of his AUI stock. (In August 2013, the Illinois legislature amended the Securities Law to remove this provision.) While we disagree with that conclusion, we nonetheless find that a separate limitations period in Illinois law operates to preclude some—but not all—of Menzies's state law claims.

## A

The Illinois Securities Law's (former) statute of repose provided that "[n]o action shall be brought under this Section or upon or because of any of the matters for which relief is granted by this Section" after five years from the securities transaction at issue. 815 ILCS 5/12(D). Illinois courts have emphasized the provision's breadth, explaining that the five-year time bar applies to *any* claim—whether brought under the Illinois Securities Law or otherwise—that fits within the statute's substantive prohibitions. See, *e.g., Tregenza v. Lehman Bros., Inc.*, 678 N.E.2d 14, 15 (Ill. App. Ct. 1997) (concluding that the Illinois Securities Law's statute of repose barred common law claims, including for fraud, because those claims were "reliant upon matters for which relief is granted by the

Securities Law"); see also *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007) (recognizing that the Illinois Securities Law's limitations periods apply to common law claims that otherwise could have been brought as securities fraud claims under the statute). So the controlling question is whether Menzies could have brought his state law claims as securities fraud claims under the Illinois Securities Law.

Section 12(F) of the Illinois law prohibits any person from "engag[ing] in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof." 815 ILCS 5/12(F). For its part, section 12(I) disallows any person from "employ[ing] any device, scheme, or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I).

If these provisions sound like the prohibitions in the federal securities laws, that is the right reaction. The Illinois legislature modeled sections 12(F) and 12(I) after parallel provisions in section 17(a) of the Securities Act of 1933. See *Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. App. Ct. 2004). Not surprisingly, then, "Illinois courts look to federal securities fraud case law in interpreting [that section] of the Illinois Securities Law." *Id.*

After outlining this same framework, the district court evaluated Menzies's state law claims by asking whether the alleged fraud fell within the ambit of sections 12(F) and 12(I) of the Illinois Securities Law. More to it, the district court asked whether the allegations in Menzies's second amended complaint reflected fraud "in connection with" the sale of his AUI stock. This, of course, was the same question at the center of the inquiry as to whether the RICO bar in 18

U.S.C. § 1964(c) precluded Menzies from bringing a civil RICO claim.

For reasons unexplained by the record, however, the district court gave two different answers to this same question. In its July 2016 opinion the district court concluded that Menzies had not alleged "an 'actionable' securities claim [within the meaning of the § 1964(c) bar], because nothing about the sale of his AUI stock itself was fraudulent in this case." *Menzies I*, 197 F. Supp. 3d at 1116. But then two years later, in its September 2018 opinion, the court determined that the five-year statute of repose in the Illinois Securities Law barred each of Menzies's state law claims because those claims met the "in connection with" requirement by alleging the "entire purpose of the tax shelter was to shield the proceeds of [Menzies's AUI] stock sale." *Menzies II,* 2018 WL 4538726, at *8. We cannot square these answers.

Regardless, our review of the district court's order dismissing Menzies's state law claims proceeds *de novo*, and, based on our own fresh look at the allegations in his second amended complaint, we cannot conclude he pleaded claims within the scope of sections 12(F) and 12(I) of the Illinois Securities Law.

We are aware of no substantive differences between the "in connection with" requirements in sections 12(F) and 12(I) of the Illinois statute and either section 17(a) of the federal 1933 Act or section 10(b) and Rule 10b-5 of the federal 1934 Act. And accepting that the Illinois courts look to the federal securities laws to interpret the Illinois Securities Law, see *Tirapelli*, 813 N.E.2d at 1142; *People v. Whitlow*, 433 N.E.2d 629, 633–34 (Ill. 1982), we see no reason to depart from our prior conclusion that Menzies's original complaint did not contain

allegations sufficient to constitute actionable securities fraud under section 10(b) and Rule 10b-5. See *Schaefer v. First Nat'l Bank of Lincolnwood*, 509 F.2d 1287, 1295 (7th Cir. 1975) (explaining that section 12 of the Illinois Securities Law "closely parallels Rule 10b-5 and a study of [the statute] reveals a nearly identical aim").

As we explained when evaluating whether Menzies's allegations fell within the RICO bar of 18 U.S.C. § 1964(c), we see an insufficient link between the alleged fraud—deception about the tax consequences of a sale of AUI stock—and the securities transaction itself. To be sure, while a "but for" connection is there, we know the law requires more. See *Ray*, 482 F.3d at 995. And Menzies's complaints do not supply the more because nowhere does he allege any misconduct that coincided with his sale of his AUI stock. See *Zandford*, 535 U.S. at 824. What this means for purposes of the RICO bar is that Menzies's allegations do not amount to actionable federal securities fraud and thus he was able to proceed with his civil RICO claim. And so, too, for purposes of the Illinois Securities Act: Menzies's state law claims are not barred by the statute's five-year period of repose.

## B

The question then becomes whether any other Illinois law bars Menzies's claims. The answer turns out to be yes as to the state law claims brought against defendants Graham Taylor, the attorney who provided legal advice to Menzies about the Euram Oak tax shelter, and his firm, Seyfarth Shaw.

The Illinois statutory provision addressing attorney misconduct contains a two-year statute of limitations and a

six-year statute of repose. See 735 ILCS 5/13-214.3. The Illinois General Assembly provided that:

> (b) An action for damages based on tort, contract, or otherwise against an attorney arising out of an act or omission in the performance of professional services … must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought.
>
> (c) [A]n action described in subsection (b) may not be commenced in any event more than 6 years after the date on which the act or omission occurred.

*Id.*

By its terms, the statute covers the claims against Taylor, as the second amended complaint plainly alleges that he provided fraudulent legal advice and opinion letters, all of which fell within his role as Menzies's counsel. The Illinois statute likewise covers Menzies's claims against Seyfarth Shaw. See *Blue Water Partners, Inc. v. Edwin D. Mason, Foley and Lardner*, 975 N.E.2d 284, 297 (Ill. App. Ct. 2012) (applying the statute of limitations in 735 ILCS 5/13-214.3 to claims against a law firm).

All that remains is a question of timing. On this score, the math is straightforward and does not compute in Menzies's favor. Even on the most generous framing of the facts—that Menzies did not discover the alleged attorney misconduct until he received his deficiency notice from the IRS and settled in December 2012—he would still be beyond the two-year

limitations period in Illinois law by filing his lawsuit in federal court as he did in April 2015. Under any timeline, then, we conclude that this provision of Illinois law bars each of the state law claims Menzies brought against Taylor and Seyfarth Shaw.

The same is not true as to the state law claims advanced against the remaining financial services defendants, Northern Trust and Christiana Bank & Trust Company. On remand the district court will retain subject matter jurisdiction over those claims under 28 U.S.C. § 1367. We leave the consideration of those claims to the district court in the first instance.

\*        \*        \*

Therefore, the judgment of the district court is AFFIRMED in part, VACATED in part, and REMANDED for proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*, dissenting in part. We should reverse the dismissal of plaintiff's RICO claims. The complaint alleges multiple acts of racketeering showing the "continuity and relationship" needed to establish a "pattern of racketeering activity." Plaintiff has alleged in detail how the defendants created an off-the-shelf tax-shelter scam—one that was easily replicable for other, similarly situated taxpayers facing substantial tax bills on large capital gains. The defendants marketed the scam to plaintiff and others. They were positioned to keep the fraud going unless and until they were stopped.

The majority errs by finding insufficient plaintiff's allegations of a "pattern" of racketeering activity. The most fundamental mistake is the majority's use of the distorting lens of hindsight. The majority relies on intervening events to find no genuine threat that the defendants would have continued indefinitely with their profitable scheme. That mistake weakens RICO for both civil *and criminal* enforcement. The mistake is also contrary to substantial case law and has no apparent support in the case law. My colleagues also demand far too much from a complaint that is already quite detailed, and they fail to give plaintiff the benefit of plausible inferences from his complaint. I respectfully dissent from the dismissal of plaintiff's RICO claims.

I.  *Points of Agreement*

I agree with my colleagues on some important points, however. We agree that the securities-fraud bar to civil RICO claims, which was added to 18 U.S.C. § 1964(c) by the Private Securities Litigation Reform Act of 1995, does not apply to plaintiff's claims. We also agree on the dispositions of the defendants' various statute of limitations defenses to

plaintiff's state-law claims. I concur with the portions of the judgment that address the state-law claims.

## II. *The RICO "Pattern" Requirement*

Turning to the RICO claims: Because defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, I use harsh language to describe the actions of a well-known law firm and two otherwise-legitimate banks. I do not vouch for the truth of plaintiff's allegations. I only apply the standard of appellate review that defendants themselves have invoked: assume the factual allegations in the complaint are true, and give plaintiff the benefit of reasonable, favorable inferences that can be drawn from those allegations.

### A. *The Fraudulent Scheme*

Attorney Graham Taylor (later convicted for another tax fraud) and other attorneys at Seyfarth Shaw teamed up with bankers from Euram Bank (The European American Investment Bank), Northern Trust Corporation, and later Christiana Bank to devise a fraudulent scheme for concealing a taxpayer's receipt of a large capital gain. The defendants pitched the scheme to Menzies, his business partner Ferenc, and others.

The scheme involved a series of carefully designed paper transactions among the taxpayer, the banks, and nominally independent trusts established on the defendants' instructions, all blessed with fraudulent legal opinion letters. The strategy took several years to set up and execute just for Menzies himself, beginning about three years before he actually sold his stock in AUI to Berkshire Hathaway.

The complaint describes the scheme in great detail. A brief description of the "Euram Oak Strategy," must be incomplete but can help show its complexity and why plaintiff characterizes the scheme as a "product" that defendants used at least several times and threatened to continue to repeat.

The scheme used a network of trusts and a dizzying array of sham transactions to disguise the ownership of AUI stock and to enable Menzies to obscure a large capital gain upon the eventual sale of the stock. See Second Amended Cplt. (SAC) ¶¶ 65–97 (detailing the 2003 and 2004 transactions). Menzies began to execute defendants' fraudulent "Euram Oak Strategy" in 2003. First, defendants had him borrow $19 million from Euram and deposit those funds in another Euram account in the name of a trust that the defendants had just set up for him. SAC ¶ 74. The trust reinvested the proceeds with Euram itself, in return for a promissory note. The defendants then set up another trust for Menzies and orchestrated a series of sham transactions among Menzies and the trusts. SAC ¶ 79.

Menzies then swapped assets with the original trust, accepting the Euram promissory note in exchange for an equal value of AUI stock, and used the note to pay off his original loan obligation. SAC ¶¶ 83–85. After another series of transactions involving the movement of assets and the termination of the first trust, the second trust held $19 million of AUI stock and owed Menzies $19 million. SAC ¶ 90. Throughout all of this, the funds from the original loan never left Euram.

In 2004, the defendants led Menzies through another series of similar transactions with a new $54 million loan from

Euram. SAC ¶¶ 95–96. After these transactions, another $54 million of AUI stock was in the second trust, with a corresponding obligation from the trust to Menzies.

The payoff came in 2006, when Menzies and Ferenc agreed to sell their business to Berkshire Hathaway. As part of the deal, Berkshire Hathaway paid the remaining trust more than $64 million for the shares that Menzies had placed there. SAC ¶ 132. The trust then used the proceeds from the sale to repay Menzies the amount it owed him.

Pursuant to advice from the defendants, when Menzies filed his 2006 tax return, he did not report his capital gain of more than $44 million. SAC ¶ 143. In 2009, the IRS began an audit of Menzies, finding that the key transfers of stock were not arms-length transactions and that the scheme constituted an abusive tax shelter SAC ¶¶ 138–40. In 2012, Menzies settled with the IRS, paying $6.7 million in capital gains tax, $1.3 million in penalties, and $2.4 million in interest.

B. *Allegations of a "Pattern"*

The complaint includes detailed allegations about the scope of the defendants' scheme, their efforts to market it and its variations, and the threat of continued criminal activity. See SAC ¶¶ 25–27, 50–55, 69, 82, 89, 122, 157–58, 180–84. The defendants' scheme was not like a custom-designed suit, cut just for Menzies. It was more like an off-the-rack suit: it would fit a specific class of taxpayers with just a few individual alterations at minimal effort and cost. With repetition, costs per taxpayer-client would drop and the defendants' profits from fees would rise, adding to the incentive for and the threat of repetition. The potential for repeated use of the fraudulent tax shelter helps show why plaintiff has alleged a

pattern of racketeering activity. See SAC ¶ 157 ("it is the very nature of a tax shelter product, such as the Euram Oak Strategy, to be created once and then replicated multiple times to multiple taxpayers").

The complaint does not rely on conclusions to show a pattern. It includes specific factual allegations showing the replicable nature of the fraudulent tax shelter and the threat of continued fraud with other taxpayers. For example, defendants presented plaintiff with slick marketing materials for the tax shelter—prepared with Euram—that came with a disclaimer addressed generally to "investors."[1] Before defendants would discuss the details of their proposed tax shelter, they required Menzies to sign a confidentiality agreement, which the complaint describes as "typical in the presentation of purportedly proprietary tax shelter products," SAC ¶ 36, indicating that defendants saw their ingenuity as a proprietary secret from which they could continue to profit by repetition. One can also reasonably infer that the confidentiality agreement had the effect of deterring or preventing targets from seeking truly independent legal and tax advice.

Other paragraphs of the complaint show that the defendants marketed to Menzies and Ferenc an off-the-rack product that they were adapting from previous applications for other clients. The defendants themselves noted the similarity between Menzies's transactions and the transactions carried out for these other clients, referred to in the briefs as "the Arizona investor" and "the North Carolina

---

[1] The Power-Point slides, labeled as Euram products, are an appendix to the complaint.

investor." When the other defendants recruited Christiana Bank to act as a supposedly independent trustee for Menzies and Ferenc, they told Christiana that the proposed transactions would be "very similar" to previous transactions carried out for the Arizona investor. SAC ¶ 50. When later sending documents to Christiana, the other defendants said the documents "should be familiar to you from the [Arizona] transaction," and were "very similar" to those used in the Arizona transaction. SAC ¶ 78. When the other defendants sent more documents to Christiana for the proposed Menzies and Ferenc transactions, they said the transaction would be "in essence identical to that for" the Arizona investor. SAC ¶ 82. Another email to Christiana described the Menzies and Ferenc transactions as "two new trades involving the Oak structure." SAC ¶ 89.

Thus, the defendants themselves described the tax shelter strategy as a template that they had used before, were adapting to Menzies and Ferenc, and could continue replicating and adapting for other taxpayers. As the complaint alleges, these sorts of communications helped demonstrate "a continued threat that the Euram Oak strategy could later be replicated for other taxpayers." *Id*.

C.  *"Continuity Plus Relationship"*

These detailed allegations easily satisfy pleading requirements for a civil RICO claim, including the required "pattern of racketeering activity." To start with RICO basics, "racketeering activity" is defined with a long list of specific crimes and categories of crime. 18 U.S.C. § 1961(1). That list includes mail fraud and wire fraud under 18 U.S.C. §§ 1341 & 1343. As a matter of general federal criminal law, each individual mailing or interstate wire transmission in further-

ance of a scheme to defraud can count as a separate act of mail or wire fraud.[2]

RICO provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity'" that occur within ten years of each other. 18 U.S.C. § 1961(5). The Supreme Court has interpreted this to require that the predicate acts of racketeering activity show "continuity plus relationship." See *Roger Whitmore's Auto Services, Inc. v. Lake County*, 424 F.3d 659, 672 (7th Cir. 2005), quoting *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989), quoting in turn 116 Cong. Rec. 18940 (1970) (Sen. McClellan), quoting S. Rep. No. 91–617, at 158. The majority's restrictive approach to the pattern requirement here has lost sight of the point the Supreme Court emphasized in *H.J., Inc.*: the statutory language shows that "Congress intended to take a flexible approach, and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." 492 U.S. at 238.

Our decisions have long recognized this need for flexibility in applying the pattern requirement. In *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986), we anticipated

---

[2] E.g., *United States v. Bush*, 522 F.2d 641, 649 (7th Cir. 1975) ("Each of the eleven counts of the indictment charges only one offense—a mailing in furtherance of one multifaceted scheme in violation of the mail fraud statute."); *United States v. Brighton Building & Maintenance Co.*, 435 F. Supp. 222, 229 n.10 (N.D. Ill. 1977) (Flaum, J.), citing *United States v. Joyce*, 499 F.2d 9, 18 (7th Cir. 1974), quoting in turn *Badders v. United States*, 240 U.S. 391, 394 (1916); see also *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648 (2008) (observing that each individual mailing in furtherance of single scheme to defraud is predicate act of mail fraud under RICO).

the holding of *H.J., Inc.* and rejected a rigid requirement of "separate schemes." In applying the "continuity plus relationship" standard, we recognized that many factors would be relevant, including "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id*. We cautioned, however, that having one overall scheme or even just one victim would not automatically defeat the pattern requirement: "The doctrinal requirement of a pattern of racketeering activity is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative." *Id*. at 976. *Morgan* reversed dismissal in a case with a much weaker claim of a pattern than we see here. The plaintiffs alleged that defendants committed several acts of mail fraud over several years in furtherance of one overall scheme to defraud plaintiffs through foreclosure sales: "While these acts can be viewed as part of a single grand scheme, they were ongoing over a period of nearly four years in addition to being distinct acts. Under the facts of this case, plaintiffs have satisfied both the continuity and relationship aspects of the pattern requirement." *Id*. [3]

---

[3] The flexibility of the pattern standard is evident in this circuit's pattern criminal jury instructions, which suggest the following general explanation for charges under 18 U.S.C. § 1962:

> Acts are related to each other if they are not isolated events, that is, if they have similar purposes, or results, or participants, or victims, or are committed a similar way, [or have other similar distinguishing characteristics] [or are part of the affairs of the same enterprise].

Finding both continuity and relationship here is consistent with our decisions that have recognized the generality and flexibility of the standard, eschewing rigid rules in both criminal and civil RICO cases. See, e.g., *United States v. Horak*, 833 F.2d 1235, 1240 (7th Cir. 1987) (affirming RICO conviction; defendants' three bribes to local officials with monthly payments were sufficient to show pattern under flexible standard aimed at ongoing crimes); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278–79 (7th Cir. 1989) (affirming jury verdict for plaintiffs on pattern issue where defendants' fraud and theft injured four victims in separate transactions over a period of months); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1152 (7th Cir. 1990) (describing *Ashland Oil* activity as open-ended scheme that threatened continued crime, and confirming that *Morgan* test is consistent with *H.J., Inc.*); *DeGuelle v. Camilli*, 664 F.3d 192, 202–04 (7th Cir. 2011) (reversing dismissal of RICO claim; pattern shown where defendant corporation and its agents allegedly carried out tax fraud scheme over several years and retaliated against plaintiff-whistleblower); *United States v. Maloney*, 71 F.3d 645, 661 (7th Cir. 1995) (affirming RICO conviction of corrupt judge; bribes and criminal acts to conceal them showed sufficient pattern under "relatively broad standard" of *H.J., Inc.*); see also *RWB Services, LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688–89 (7th Cir.

---

There is continuity between acts if, for example, they are ongoing over a substantial period, or if they are part of the regular way some entity does business or conducts its affairs.

Under this instruction, a jury that heard proof of plaintiff's allegations here could easily find a pattern.

2008) (reversing dismissal of RICO claim for scheme to defraud Wal-Mart and its customers; pattern *conceded* where defendants sold 50,000 stolen and/or repackaged cameras as new). With such plausible and detailed allegations of a pattern as we have here, especially when made on the basis of quite limited discovery, the better course is to let the case go forward, let the case develop, and decide the pattern issue on a full record.[4]

As the majority acknowledges, the relationship prong of "continuity and relationship" test can be satisfied by criminal acts close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission. See *H.J., Inc.*, 492 U.S. at 240. The majority and I agree that the relationship prong is satisfied here. Plaintiff has alleged very similar efforts by the defendants to carry out the tax-shelter scam with him and with his partner Ferenc, who received a similar large capital gain in 2006. In those two episodes of the fraudulent scheme, we have multiple acts of mail and wire fraud, and we have similar victims, the same criminal participants, and the same means of commission, all undertaken for similar purposes at around the same time.

The majority correctly finds that plaintiff has alleged with sufficient specificity the defendants' fraudulent efforts to target both him and his partner Ferenc through criminal

---

[4] Plaintiff will be entitled to further discovery from defendants on his surviving state-law claims. What will the federal courts do if that discovery turns up more detailed evidence of additional attempts by defendants to sell the Euram Oak and Euram Rowan strategies such that the scheme would satisfy even the majority's restrictive view of the pattern requirement? Will we reconsider our premature dismissal?

mail and wire fraud, so that both episodes add up to racketeering activity. Ante at 19–20. The majority also correctly recognizes that the allegations about Ferenc are sufficient even though he apparently did not go through with the proposed scam. *Id.*, citing *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992).[5]

Thus, the majority agrees that plaintiff has sufficiently alleged two distinct but related episodes in which the defendants carried out their fraudulent scheme. The remaining requirement of "continuity" is what divides us.

D. *Open-Ended Continuity*

The two fraudulent episodes aimed at Menzies and Ferenc should be sufficient to establish a pattern. By design, each episode lasted several years. Each episode required numerous acts of mail and wire fraud and elaborate sequences of otherwise-useless financial transactions. Each episode produced hundreds of thousands of dollars in fees for the defendants. This should be sufficient. See *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783, 795–96 (6th Cir.

---

[5] See also *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648 (2008) (civil RICO plaintiff alleging mail fraud need not prove it relied on defendant's misrepresentations), citing *Neder v. United States*, 527 U.S. 1, 24–25 (1999) (common-law requirement of justifiable reliance has no place under mail, wire, or bank fraud statutes); *United States v. Bucey*, 876 F.2d 1297, 1311 (7th Cir. 1989) ("this court has reiterated on numerous occasions that the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution"); *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988). The majority does not say so forthrightly, but its description of the district court's decision, see ante at 18, shows that the district court erred by focusing on whether Ferenc and the Arizona and North Carolina investors actually followed through all the way with the fraudulent strategy.

2012) (reversing dismissal of civil RICO claim based on marketing of fraudulent tax shelter; pattern alleged adequately where defendants marketed shelter over period of five years); *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 962–64 (7th Cir. 1996) (affirming civil RICO conspiracy verdict for plaintiff; scheme to defraud all limited partners to sell interests established pattern; even though evidence appeared to point to only one scheme, "an inference can be drawn that the various defendants certainly had the means to conduct similar schemes"); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 396–97 (6th Cir. 1989) (reversing dismissal of civil RICO claim based on marketing of fraudulent tax shelter; defendants alleged to have acted in concert over five years, defrauding hundreds of taxpayers); *Durham v. Business Management Associates*, 847 F.2d 1505, 1512 (11th Cir. 1988) (affirming denial of summary judgment; plaintiffs offered evidence of pattern with two related schemes to market fraudulent tax shelters, and schemes' similarity presented jury question; "use of business instructional video cassette tapes" deemed significant); *United Energy Owners Committee, Inc. v. U.S. Energy Management Systems, Inc.*, 837 F.2d 356, 360–61 (9th Cir. 1988) (reversing dismissal of civil RICO claim based on marketing of fraudulent tax shelter; pattern alleged adequately where defendants engaged in multiple fraudulent acts involving multiple victims over more than one year; no rigid requirement for plaintiff to allege or prove more than one criminal "episode").

The complaint easily satisfies the "pattern" requirement when the Menzies and Ferenc episodes are combined with the detailed allegations of a reasonably foreseeable threat of continued efforts to repeat the scheme with still more similarly situated taxpayers. In the rubric of RICO patterns,

plaintiff has alleged "open-ended continuity," that is, "past conduct that by its nature projects into the future with a threat of repetition." *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 782 (7th Cir. 1994), quoting *H.J., Inc.*, 492 U.S. at 241.

The majority, however, rejects open-ended continuity, saying: "Only a few lines of the second amended complaint even hint at any threat of continued fraud by the defendants, and even then Menzies presented only conclusory assertions to support those allegations." Ante at 23. With respect, that description is just wrong. The majority's rejection of open-ended continuity is based on two related errors: relying on hindsight and failing to give the plaintiff the benefit of his detailed allegations.

## 1. *Hindsight Error*

First, the majority makes the basic error of giving the defendants the benefit of hindsight rather than considering the threat of continued fraud as it was happening. The majority (like the district court) emphasizes the 2005 indictment and 2008 conviction of attorney Taylor for an unrelated tax fraud: "With Taylor out of the factual equation it is unclear how Menzies's complaint supports any inference that the alleged scheme would continue." Ante at 24. This is wrong as a factual matter. According to the complaint, Taylor's indictment in 2005 most certainly *did not deter him* and the other defendants from *continuing* the effort to defraud Menzies in 2006 and 2007 with respect to his 2006 tax return. There is also no reason the other defendants could not have continued the scheme with another Seyfarth Shaw lawyer or two.

More fundamental, though, is the legal error. Taylor's 2008 conviction was an intervening event that at most interrupted the ongoing scheme. Extensive RICO case law shows that such an intervening event is not relevant to the threat of repetition. The same is true of the other events from 2007 and 2008 that the majority suggests are "indications that the scheme was running its course … and was not being shopped to new targets." Ante at 24. (Affirming dismissal based on "indications" and "suggestions" in a complaint is not consistent, of course, with the more generous reading of complaints required in deciding Rule 12(b)(6) motions, but I digress.)

To see the problem with determining continuity based on hindsight, consider how we and other federal courts would consider this same defense to a RICO charge against members of a street gang. Suppose the evidence showed that after two profitable episodes of robbery, each time following the same careful plan, the gang's leader was arrested and later convicted on unrelated charges. In a RICO prosecution alleging a pattern of robberies, the other gang members then argue they must be acquitted because there was no pattern: "We stopped committing crimes after our leader was indicted, arrested, and later convicted." In a criminal case, that argument would be laughed out of court. E.g., *United States v. Aulicino*, 44 F.3d 1102, 1113–14 (2d Cir. 1995). Yet the "pattern of racketeering activity" standard is the same for both civil and criminal RICO. The majority's error in this civil case will unduly narrow criminal applications of RICO where ongoing schemes are interrupted by arrests, indictments, convictions, or other events.

The majority's reliance on hindsight runs contrary to *Au-licino* and numerous other RICO precedents, which establish that courts do not rely on hindsight and intervening events to show the absence of a threat of repetition. In *Aulicino*, the defendants operated a kidnapping ring that carried out about seven kidnappings over a period of three and a half months. 44 F.3d at 1105. The kidnappings ended after one leader was murdered and another was arrested on other charges. The defendants argued that the government had failed to prove a pattern, but the Second Circuit affirmed the RICO convictions. The Second Circuit did not use hindsight to find that the intervening events (the murder and arrest of two leaders) had defeated a threat of continued crimes. Instead, the Second Circuit found a sufficient threat of contin-ued racketeering activity. The kidnappings were successful and profitable. 44 F.3d at 1113. "The ring's activities were abandoned; they were not a discrete and finite project that came to a natural end." *Id.* at 1114. The same description fits these defendants' fraud.

The Sixth Circuit rejected a similar argument based on hindsight in *United States v. Busacca*, 936 F.2d 232 (6th Cir. 1991). A pension official was convicted under RICO for em-bezzling funds to pay for his defense in an earlier prosecu-tion. He had obtained money illegally over only three months. *Id.* at 236. He argued that there was no threat of con-tinuity because his opportunity for embezzlement ended with his earlier conviction and his removal from office, much as defendants here and the majority argue that Taylor's in-dictment and conviction ended the threat of continuity.

The Sixth Circuit rejected that argument based on hind-sight and found open-ended continuity: "The manner in

which the embezzlements occurred was capable of repetition indefinitely into the future, as long as there were either legal fees or other expenses which Busacca wanted paid." *Id.* at 238. In words that apply directly here, the "analysis of the threat of continuity cannot be made solely from hindsight" and must instead "be viewed at the time the racketeering activity occurred." *Id.* The majority rejects that approach here, and it is hard to see why, especially since it weakens criminal application of RICO where intervening events interrupt ongoing criminal schemes.

The Sixth Circuit applied this principle more recently in a civil RICO case, *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393 (6th Cir. 2012). The individual defendants argued that because the defendant adoption business they owned was shut down as part of a criminal prosecution, there had not been an open-ended threat of continued crimes. *Id.* at 410. The Sixth Circuit rejected the argument and reversed dismissal of civil RICO claims: "Subsequent events are irrelevant to the continuity determination … because 'in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred.'" *Id.*, quoting *Busacca*, 936 F.2d at 238. "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.'" *Heinrich*, 668 F.3d at 410, again quoting *Busacca*, 936 F.2d at 238, and citing *Blue Cross & Blue Shield of Michigan v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (reversing dismissal on pattern issue; open-ended continuity alleged because, if defendant had not been caught, there was no reason to believe he would not still be submitting fraudulent insurance claims). In language that applies

directly here, *Heinrich* explained that when the defendants committed the four predicate acts, "there was no indication that their pattern of behavior would not continue indefinitely into the future." 668 F.3d at 411. Dismissal under Rule 12(b)(6) was reversed, just as we should reverse here.

In fact, the district judge who dismissed this case made exactly this point—even quoting *Heinrich*—in denying dismissal in another civil RICO case:

> It is important to note that, in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed "at the time the racketeering activity occurred." Subsequent events "are irrelevant." Thus, a lack of a threat of continuity "cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict."

*Inteliquent, Inc. v. Free Conferencing Corp.*, 2017 WL 1196957, at *10 (N.D. Ill. 2017), quoting *Heinrich*, 668 F.3d at 410, and citing *CVLR Performance Horses, Inc. v. Wynne*, 524 Fed. App'x 924, 929 (4th Cir. 2013). In *Inteliquent*, Judge Blakey found correctly that the plaintiff had sufficiently alleged an open-ended pattern of racketeering activity through a series of fraudulent invoices under a contract that would renew automatically and that could be expected to be renewed. As a result, there was no natural ending point or "clear and terminable goal" for the scheme. *Id*. He was right then; he was wrong in this case.

In a criminal case, we have also held that even a brief scheme cut short by intervening events can establish a

pattern if the scheme threatened to continue from the perspective of the time the racketeering activity occurred. In *United States v. O'Connor*, 910 F.2d 1466 (7th Cir. 1991), a police officer committed several acts of extortion over a two-month period. The acts of extortion ended with his arrest. We held that the evidence permitted the trier of fact to conclude that he "had committed himself to an enduring series of criminal acts, sufficient to establish a 'pattern' under *H.J. Inc*." *O'Connor*, 910 F.2d at 1468. The Second Circuit in *Aulicino* cited *O'Connor* to support its approach to open-ended continuity. 44 F. 3d at 1112–13.

These cases can all be contrasted with schemes with no open-ended continuity, which are those with discrete and finite goals or natural end points. For example, in *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 783 (7th Cir. 1994), we found no open-ended continuity where the predicate acts of fraud involved one particular contract and a finite scheme that did not threaten continued wrongdoing. For other examples of inherently finite schemes, see *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 829–30 (7th Cir. 2016) (reversing plaintiff's verdict under civil RICO for lack of pattern; scheme to bribe governor to secure enactment of one new law did not pose threat of open-ended continuity because scheme had a "natural ending point"); *Vemco, Inc. v. Camerdella*, 23 F.3d 129, 134–35 (6th Cir. 1994) (alleged fraud in one construction contract over 17 months did not pose threat of continued wrongdoing); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (five-month fraudulent scheme involving sale of lots on one divided tract of land was "an inherently short-term affair").

Against this substantial case law showing that courts do not rely on hindsight and intervening events to avoid recognizing a continued threat of crimes in both criminal and civil RICO cases, the majority offers no support for its reliance on hindsight. Curiously, rather than respond to the applicable precedent and reasoning, the majority instead denies that it is relying on hindsight. Ante at 25. It's hard to take that denial seriously, though. The majority tells us quite plainly: "What is missing from Menzies's second amended complaint is any factual allegation supporting his conclusion that, following Taylor's arrest and indictment, there existed a threat of the defendants fraudulently marketing the tax shelter into the indefinite future." *Id*. Put aside the fact that defendants actually *did* continue their scheme after Taylor's indictment. Where does that supposed requirement come from, if not from hindsight and reliance on intervening events? This mistaken reliance on hindsight offers a windfall to RICO defendants in both civil and criminal cases.

### 2.  *The Detailed Allegations of Continuity*

The majority also errs by simply failing to engage with the extensive factual details alleged in the complaint that indicate a threat of repetition and support open-ended continuity. The majority also fails to give the plaintiff the benefit of favorable inferences from his allegations. The complaint uses the right labels and descriptors—"regular way of conducting and participating in an ongoing criminal enterprise," SAC ¶ 26; "part of [a] pattern of similar or identical activity by Defendants, as tax shelter promoters, advisors, and others that had the same or similar purposes, results, participants, victims, or methods of commission" ¶ 157; "it is the very nature of a tax shelter product, such as

the Euram Oak Strategy, to be created once and then replicated multiple times to multiple taxpayers," ¶ 157; "[t]he threat of repetition and continued criminal activity is implicit, as there was a continued threat that it later could be replicated for other taxpayers," ¶ 158; defendants' "predicate acts of mail and wire fraud were part of their regular way of conducting business," ¶ 183; and defendants' "pattern of criminal conduct … projects into the future," as illustrated by "the manner in which the Euram products were presented as products, with a preexisting team that could execute and support the tax shelter for other taxpayers and from the regular manner in which this enterprise did business with Menzies, Ferenc, [the Arizona and North Carolina investors], and other investors in fraudulent Euram strategies," ¶ 184.

These general allegations are made more plausible by the extensive details about how defendants carried out the fraud with Menzies and Ferenc. The majority fails to recognize that defendants themselves described those schemes as "very similar" to and "in essence identical" to transactions with the Arizona investor. The complaint also describes the similar "Euram Rowan Strategy" with the North Carolina investors (without Northern Trust, however). To one another, they further described Menzies and Ferenc transactions as "two new trades involving the Oak structure." And the defendants presented the fancy marketing materials to Menzies with a disclaimer addressed to "investors" and demanded that prospective clients sign confidentiality agreements before the scheme could be explained to them. These details provide ample support for the allegation that defendants would continue marketing identical or closely similar fraudulent tax shelters to other taxpayers. Neither defendants nor

the majority have identified any natural ending point for this profitable scheme.

In rejecting open-ended continuity, the majority fails to apply the proper standard of review, which gives the plaintiff the benefit of reasonable inferences from the allegations. Of course there was a threat of continued fraudulent episodes! As long as the defendants were getting away with this scam, why should they have stopped with the Arizona investor, Menzies, and Ferenc? They had developed a profitable product, one that promised their clients millions of dollars in tax savings and assured defendants hundreds of thousands of dollars in fees every time it was used. In the law we ordinarily assume that people are rational actors. Here, that means that we would expect defendants to continue with their profitable venture.

Giving plaintiff the benefit of his allegations and reasonable inferences from them—and *viewed at the time of the alleged fraud*—these were "predicate acts, which by their very nature, pose[d] 'a threat of repetition extending indefinitely into the future or [were] part of an ongoing entity's regular way of doing business.'" *McDonald v. Schencker*, 18 F.3d 491, 497 (7th Cir. 1994), quoting *H.J., Inc.*, 492 U.S. at 242.

E.  *Closed-Ended Continuity*

Plaintiff's strong case of open-ended continuity should be sufficient to warrant reversal here, but the majority also errs in rejecting closed-ended continuity. The majority criticizes plaintiff for not alleging in more fulsome detail the specifics of defendants' efforts to defraud the Arizona investor and the North Carolina investor using the same fraudulent tax shelter or the Euram Rowan variant. Ante at 20. In doing so,

the majority imposes an unfair and excessive pleading requirement that goes beyond Rule 9(b) and any need for fair notice to defendants.

The pleading requirement is unfair because the defendants have thus far kept the cloak of attorney-client privilege around the content of some of their fraudulent communications with the Arizona and North Carolina investors and others. Given the IRS's rejection of these abusive tax shelters, there are ample reasons to think that the crime-fraud exception would apply to pierce the privilege, which may still occur on remand of some of plaintiff's state-law claims. See generally *Valero Energy Corp. v. United States*, 569 F.3d 626 (7th Cir. 2009) (discussing statutory tax-practitioner privilege that parallels attorney-client privilege and is subject to exceptions for crime and fraud, as well as promotion of tax shelters, 26 U.S.C. § 7525).

The majority's pleading requirement is excessive because it discounts the complaint's plausible allegations about the fraud aimed at the North Carolina and Arizona investors. In rejecting closed-ended continuity, the majority relies on *Emery v. American General Finance, Inc.*, 134 F.3d 1321 (7th Cir. 1998), which affirmed dismissal of a civil RICO complaint for failure to allege with sufficient particularity facts concerning alleged victims in addition to the named plaintiff. *Emery* is readily distinguishable. That complaint alleged only one victim with any particularity or evidence. It did not involve an off-the-shelf fraudulent product that could be repeated easily with additional targets. The plaintiff in *Emery* was not able to provide any meaningful details about the alleged fraudulent letters to other alleged victims, who apparently did not

keep any documents or remember anything about the scheme. 134 F.3d at 1323.

By comparison, the North Carolina and Arizona investors spent on the order of a million dollars each on the defendants' fraudulent professional services. These investors experienced multimillion-dollar tax bills, with penalties and interest. Unlike the other targets in *Emery*, these victims do not seem to have forgotten the incidents or thrown away the relevant documents. And recall that defendants themselves described the transactions as "in essence identical" and "very similar" to the transactions with Menzies and Ferenc. SAC ¶¶ 50, 82.

Even with these handicaps, plaintiff has identified some specific fraudulent communications for the North Carolina and Arizona investors, sufficient to satisfy Rule 9(b). ¶¶ 160–64, 166–78. The closed-end theory should not fail simply because plaintiff has not yet seen those fraudulent opinion letters. Defendants claim the letters are privileged, but the complaint alleges they exist and were sent. It's not difficult to infer what they said. If the letters had not asserted the fraudulent shelters were legal, there of course would have been no point in the transactions. See SAC ¶¶ 162, 177. The inference that the defendants' opinion letters say fraudulently that the tax shelters would be legal is not merely plausible but compelling. The allegations about the opinion letters and related communications provide sufficient information about the who, what, when, where, and how of the fraud to satisfy Rule 9(b) regarding the other investors.

As discussed above, it also does not matter whether a particular taxpayer-client was deceived regarding the tax shelter's legality. If he was not deceived and did not go

through with the transaction, there was at least an attempt to defraud by the defendants. If the targeted taxpayer was not deceived, understood the transaction, and went through with it, he was joining a criminal venture to defraud the federal government. Either way, that's another episode of fraud in implementing the scheme.

Even with the limited information available to him, plaintiff provided sufficient information about these additional instances of fraud to satisfy the RICO pattern requirement and Rule 9(b). By affirming dismissal of the RICO claims, the majority unfairly rewards defendants for their efforts to cover up their attempts to defraud other investor-taxpayers.

Because the majority has adopted an erroneous, restrictive view of the RICO pattern requirement, giving defendants the benefit of hindsight and failing to give plaintiff the benefit of his allegations, the majority is substantially weakening both civil and criminal RICO. I respectfully dissent from the dismissal of plaintiff's RICO claims.